**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| 740SS, LLC, a Utah limited liability company,<br><br>        Plaintiff,<br><br>vs.<br><br>AIRCRAFT TRANSPORT SERVICES, INC., a Florida corporation; JOHN SCOTTO, an individual; SUSAN KEISTER, an individual, MICHAEL KEISTER, an individual, and AL BABBINGTON, an individual,<br><br>        Defendants. | CASE NO.:   _____ - Civ |

## COMPLAINT

740SS, LLC ("Plaintiff") brings this action against Aircraft Transport Services, Inc. ("ATS"), John Scotto ("Scott"), Michael Keister ("M. Keister"), Susan Keister ("S. Keister"), and Al Babbington ("Babbington") (collectively "Defendants") as follows:

## NATURE OF THE ACTION

1.      This is a civil action for, *inter alia*, breach of contract based on Defendants' breach of multiple contracts, including the agreement to repaint and refinish the interior of the Gulfstream Aerospace Aircraft with registration number N740SS (the "Gulfstream"), the Aircraft Lease Agreement ("Lease Agreement") and the Settlement Agreement, Release, and Lease Amendment ("Settlement Agreement."). Plaintiff seeks immediate preliminary and permanent injunctive relief to prevent irreparable harm.

**VENUE AND JURISDICTION**

2.      Venue is proper in this Court pursuant to the Lease Agreement, which provides for exclusive venue in the Courts situated within Dade County, Florida.

3.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332. There is complete diversity between the parties because Plaintiff is domiciled in Utah. Upon information and belief, none of the Defendants are domiciled in Utah.

4.      This Court has personal jurisdiction over Defendants pursuant to the Lease Agreement and also because Defendants are either domiciled in or have engaged in regular and substantial business in the State of Florida within the Southern District of Florida.

**THE PARTIES**

5.      Plaintiff is a Utah limited liability company that is domiciled in Utah.

6.      Defendant ATS is Florida corporation, with its principal place of business located in Melbourne, Florida.

7.      Defendant Scotto is an individual who, upon information and belief, resides in New York City, New York.

8.      Defendant M. Keister is an individual who, upon information and belief, resides in Dade County, Florida.

9.      Defendant S. Keister is an individual who, upon information and belief, resides in Dade County, Florida.

10.      Defendant Babbington is an individual who, upon information and belief, resides in Dade County, Florida.

**FACTUAL BACKGROUND**

11.     On or around December 22, 2022, Plaintiff entered into an Aircraft Purchase Agreement to purchase the Gulfstream from ATS for $10,750,000.

12.     Although the Gulfstream was purchased "as is", ATS, Babbington, and M. Keister, on behalf of S. Keister, specifically and separately agreed that they would pay and/or cover the costs to repaint the exterior of the Gulfstream and refinish the interior of the Gulfstream (the "Repair Agreement").

13.     The Repair Agreement that ATS, Babbington, and M. Keister, on behalf of S. Keister, would pay to repaint and refinish the interior of the Gulfstream was specifically made after Plaintiff acquired the Gulfstream from ATS.

14.     ATS, Babbington, and M. Keister, on behalf of S. Keister, also repeatedly reaffirmed and acknowledged the Repair Agreement and the obligation to cover the costs to repaint the exterior and refinish the interior of the Gulfstream.

15.     In or around 2023, Scotto acquired ATS.

16.     Upon information and belief, Scotto agreed to be jointly and severally liable for the contractual obligation to cover the costs to repaint the exterior and refinish the interior of the Gulfstream.

17.     At or around the same time that Plaintiff acquired the Gulfstream, Plaintiff entered into the Lease Agreement with ATS.

18.     Under the terms of the Lease Agreement, ATS agreed to lease the Gulfstream from Plaintiff. A true and accurate copy of the Lease Agreement is attached to this Complaint as **Exhibit "1"**.

3

19.     As payment for the lease, ATS agreed to pay Plaintiff $95,000 per month. *See* Lease Agreement at 6, 9, Exhibit C.

20.     In the event ATS failed to make timely payments to Plaintiff under the Lease Agreement, ATS agreed to pay "[t]he greater of six percent (6%), or 2% over the rate announced by Citibank, N.A. in Florida as its 'prime rate' from time to time, but not to exceed the maximum amount permitted by Law." *Id.* at Exhibit C.'

21.     ATS was also obligated to maintain "at its own cost and expense" the "enrollment of each Engine in the Engine Maintenance Program" and to "maintain each Engine in accordance with the Maintenance Program, including the performance of all Routine Engine Maintenance and all non-routine maintenance work in order to maintain each Engine in as good operating condition as when delivered, reasonable wear and tear excepted." *Id.* § 6.3(e)(f).

22.     The Engine Maintenance Program referred to the Rolls-Royce Corporate Care on Engines Program, which program ensured that the Gulfstream's engines remained in proper working condition.

23.     ATS was also obligated to maintain all records and logs relating to the Gulfstream during the life of the Lease Agreement. *See id.* at § 6.3(c).

24.     Section 17.3 of the Lease Agreement obligates ATS to pay for all legal fees and costs caused by its default. *Id.* at § 17.3

25.     The term of the Lease Agreement runs from December 2022 until December 2025. *See id.* at 6.

26.     Starting in or around 2023, ATS failed to timely make the lease payments.

27.     ATS quickly fell behind on its payments and owed a significant sum to Plaintiff.

28.     In the fourth quarter of 2024, Plaintiff notified ATS of its breach of the Lease Agreement, demanded payment of all amounts owed, notified ATS of its failure to make the required payments to maintain the Engine Maintenance Program, and demanded that the Gulfstream be sequestered from any further operations by ATS. *See* October 22, 2024 Demand Letter, **Exhibit 2**; *see also* November 22, 2024 Demand Letter, **Exhibit 3**.

29.     After various communications about ATS' default, the parties ultimately reached the Settlement Agreement. *See* Settlement Agreement, **Exhibit 4**.

30.     Under the terms of the Settlement Agreement, ATS agreed to pay $294,193 to cover past due rent and prorated rent for January 2025. *Id.* at § 1.

31.     ATS also agreed to pay an amendment fee of $10,000. *Id.* at § 2.

32.     ATS agreed to deliver the Gulfstream to the Phoenix-Goodyear Airport in Arizona on or before January 3, 2025. *Id.* at § 3.

33.     ATS agreed to deliver the logbooks and maintenance records to Plaintiff by no later than January 3, 2025. *Id.* at § 4.

34.     ATS agreed to limit flight hours to no more than 90 hours in December 2024. *Id.* at § 5.

35.     In the event that ATS satisfied each of its obligations in Sections 1-5 of the Settlement Agreement, Plaintiff agreed to release its claims against ATS and also to amend the Lease Agreement such that it terminated on January 3, 2025. *Id.* at §§ 6-7.

36.     The Settlement Agreement also made clear that time was of the essence on all dates and time constraints set forth in the agreement. *Id.* at § 15.

37.     The Settlement Agreement also entitled the prevailing party in any dispute relating to the Settlement Agreement to recover its attorneys' fees. *Id.* at § 11.

38.     In or around December 2024, Plaintiff learned that ATS had been failing to maintain the Engine Maintenance Program.

39.     In correspondence with ATS and Scotto's counsel, Mark Goldstein, Mr. Goldstein assured Plaintiff that it would not leave Plaintiff "hanging on this," meaning that ATS would cover the costs needed to maintain the Engine Maintenance Program with Rolls Royce.

40.     ATS failed to comply with its obligations under the terms of the Settlement Agreement.

41.     ATS failed to limit its flight hours to 90 hours in the month of December.

42.     Instead, as reflected in MyCMP Aircraft Flight Log, the Gulfstream was flown 115.7 hours in December.

43.     By failing to fly 90 hours or less in December 2024, Defendants violated the Settlement Agreement, and the release and termination of the Lease Agreement became null and void.

44.     Upon recovery of the Gulfstream, Plaintiff discovered that ATS had significantly overflown the Gulfstream during the time it was ATS's possession.

45.     The overflown hours were not reported by ATS in violation of the Lease Agreement.

46.     The total hours overflown by ATS were 990.3 hours, resulting in a required payment to Rolls Royce to maintain the Engine Maintenance Program of $807,353.30 plus penalties and interest.

47.     Plaintiff learned that ATS had failed to make the aforementioned payment and the other required payments to maintain the Engine Maintenance Program.

48.     ATS and its principal, Scotto, were obligated to make these payments but failed to do so.

49.     In May 2025, Plaintiff discovered that the contract with Rolls Royce for the Engine Maintenance Program had been terminated based on ATS' failure to pay the required invoice.

50.     Rolls Royce had been attempting to collect payment from ATS, but ATS refused to either pay or respond to Rolls Royce.

51.     As a result, the $807,353.30 amount has now increased to well over $1.5 million due to late fees.

52.     Rolls Royce has now contacted Plaintiff to recover the more than $1 million owed based on ATS' failure to pay for the overflown hours and to reinstate the Engine Maintenance Program.

53.     The Engine Maintenance Program is highly valuable to the value of the Gulfstream because it ensures that its engines function properly and are maintained based on contract prices.

54.     Without the Engine Maintenance Program, the value of the Gulfstream is depreciated by approximately $9 million.

55.     As of the date of this Complaint, the Engine Maintenance Program has been cancelled, obligating Plaintiff to buy back into the program at a significantly higher cost than it if the program had been maintained.

56.     Because ATS did not comply with the terms of the Settlement Agreement, the Lease Agreement was not terminated as of January 2025.

57.     ATS continues to owe Plaintiff $95,000 per month until the expiration date in December 2025.

58.     At the time of Plaintiff's acquisition of the Gulfstream, Babbington and S. Keister were the owners ATS on paper.

59.     However, upon information and belief, S. Keister was merely named on the ownership records of ATS because M. Keister was not eligible to be an owner of ATS.

60.     Upon information and belief, M. Keister actually acted as an owner of ATS for all intents and purposes and had an agreement with his wife that he had a beneficial interest in ATS, including for his discussions with Plaintiff about the Repair Agreement.

61.     Upon information and belief, Babbington and M. Keister dominated and controlled ATS to such a degree that ATS largely lacked an independent existence.

62.     Upon information and belief, Babbington and M. Keister and/or S. Keister used ATS's corporate form either fraudulently or for an improper purpose, including to avoid liability for purchases and sales that were largely done to benefit Babbington and M. Keister and/or S. Keister personally.

63.     Upon information and belief, Babbington's and M. Keister's and/or S. Keister's use of the corporate form for an improper purpose and/or fraudulently has caused and will cause significant harm to Plaintiff.

64.     In or around 2023, Scotto purported to acquire ATS.

65.     After the purported acquisition, and upon information and belief, Scotto became the sole owner of ATS.

66.     Upon information and belief, after its acquisition, Scotto dominated and controlled ATS to such a degree that ATS largely lacked an independent existence.

67.     Upon information and belief, Scotto used ATS's corporate form either fraudulently or for an improper purpose, including to avoid liability for lease payments owed to Plaintiff and

8

the costs to repaint the exterior and refinish the interior of the Gulfstream. All such actions were largely done to benefit Scotto personally.

68.     Upon information and belief, Scotto's use of the corporate form for an improper purpose and/or fraudulently has caused and will cause significant harm to Plaintiff.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

69.     Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs as though set forth fully herein.

70.     The Lease Agreement, Repair Agreement, and Settlement Agreement (collectively, the "Agreements") are all valid and enforceable contracts between Plaintiff and Defendants.

71.     Plaintiff performed all of its obligations under the Agreements.

72.     Defendants have materially breached the terms of the Agreements as outlined above.

73.     As a direct and proximate cause of the foregoing breaches, Plaintiff has been damaged in an amount to be determined at trial, but which amount exceeds $10,000,000 based on the depreciation of the Gulfstream, unpaid rental payments, amounts owed to Rolls Royce, unpaid interest, and attorneys' fees.

**SECOND CAUSE OF ACTION**
**(Breach of the Covenant of Good Faith and Fair Dealing)**

74.     Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs 1 through 68 as though set forth fully herein.

75.     The Agreements are all valid and enforceable contracts between Plaintiff and Defendants.

76.     Plaintiff completed all obligations imposed by the Agreement, including by leasing the Gulfstream to Defendants.

77.     All conditions required for Defendants to perform under the Agreements have occurred, obligating Defendants to perform under the Agreements.

78.     The Defendants have failed or refused to discharge their contractual responsibilities, including for the reasons outlined above, which refusal and/or failure is not consistent with the parties' reasonable expectations under the Agreements.

79.     As a direct and proximate cause of the foregoing breaches, Plaintiff has been damaged in an amount to be determined at trial, but which amount exceeds $10,000,000 based on the depreciation of the Gulfstream, unpaid rental payments, amounts owed to Rolls Royce, unpaid interest, and attorneys' fees.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

A.  Judgment in favor of Plaintiff and against Defendants on all claims and defenses asserted in this action;

B.  Damages in the amount of not less than $10,000,000, plus pre-and post-judgment interest, costs, expenses, and attorneys' fees to the extent permitted by law; and

C.  For such other further relief as this Court may deem appropriate.

DATED this 27th day of February, 2026.

> **KHL LAW**
> Trade Centre South
> 100 West Cypress Creek Road, Suite 630
> Fort Lauderdale, FL 33309
> Telephone: (954) 761-3454
> Facsimile:  (954) 761-3484
> Primary email:   gml@khllaw.com
>                            mrivera@khllaw.com

10

Secondary email: eservicefll@khllaw.com

By_____

      Glen M. Lindsay, Esq.
      Florida Bar No. 59200

# EXHIBIT "1"

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

# AIRCRAFT LEASE AGREEMENT

dated as of

December ___, 2022

between

## 740SS, LLC

as Lessor,

and

## Aircraft Transport Services, Inc

as Lessee

**Relating to that certain Gulfstream Aerospace G-V aircraft, bearing registration mark N740SS and manufacturer's serial number 532, together with two (2) Rolls-Royce model BR710A1-10 engines bearing Serial Numbers 11169 and 11170**

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

## AIRCRAFT LEASE AGREEMENT

THIS AIRCRAFT LEASE, dated as of December ___, 2022 is by and between 740SS, LLC, a Utah limited liability company ("Lessor"), and Aircraft Transport Services, LLC, a Florida limited liability company limited liability company ("Lessee"). (each of Lessor and Lessee may be referred to as a "Party" and Lessor and Lessee may collectively be referred to as the "Parties")

### WITNESSETH

WHEREAS, Lessee desires to lease from Lessor, and Lessor is willing to lease to Lessee, the Aircraft described herein, upon the terms and subject to the conditions hereinafter set forth.

NOW THEREFORE, for and in consideration of the premises, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Lessor and Lessee hereby agree as follows:

## SECTION 1 DEFINITIONS

Unless the context otherwise requires, the following terms shall have the following respective meanings for all purposes of this Agreement and shall be equally applicable to both the singular and the plural forms of the terms herein defined:

"Aircraft" shall mean the Airframe, together with (i) the Engines, whether or not installed on the Aircraft; (ii) all Parts and all components thereof; (iii) all ancillary equipment or devices furnished with the Aircraft under this Lease; (iv) all Aircraft Documents; and (v) all substitutions, replacements and renewals of any and all thereof.

"Aircraft Documents" shall mean (a) the maintenance and inspection records and all other current and historical records and documentation pertaining to the Aircraft identified in Exhibit B hereto (all of which shall be delivered to Lessee on or before the Delivery Date) and (b) the maintenance and inspection records generated and maintained by Lessee during the Term under Applicable Law, including the records required as set forth in Exhibit F hereto.

"Airframe" shall mean: (a) that certain Gulfstream Aerospace G-V aircraft, bearing registration mark N740SS and manufacturer's serial number 532 (described on the International Registry as GULFSTREAM model Gulfstream GV (GV) bearing manufacturer's serial number 532); and (b) any and all Parts which are from time to time incorporated or installed on or attached thereto or which have been removed therefrom so long as title thereto remains vested in Lessor in accordance herewith, including the terms of Section 9 hereof.

"Airworthiness Directives" or ADs shall mean all airworthiness directives of the FAA and the Aviation Authority applicable to the Aircraft.

"Allowed Cycles" has the meaning set forth in Section 6.1(c).

"Allowed Flight Hours" has the meaning set forth in Section 6.1(c).

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

"Applicable Law" shall mean: (i) any law, statute, decree, constitution, regulation, order, judgment, rule, license, permit, injunction or other directive of any Governmental Entity; (ii) any treaty, pact, compact or other agreement to which any Governmental Entity is a signatory or party; (iii) any judicial interpretation with binding characteristics or application of those described in (i) or (ii) above; (iv) any administrative interpretation with binding characteristics or application of those described in (i) or (ii) above; and (v) any amendment or revision of any of those described in (i), (ii), (iii) or (iv) above, and in each case, which is applicable to the Aircraft and its use and operation, Lessee, or the transactions contemplated by this Lease and the Operative Agreements.

"Approved Insurance Broker" shall mean an insurance broker of internationally recognized responsibility and standing specializing in aircraft insurance as is reasonably acceptable to and approved by Lessor.

"Approved Insurer" shall mean an insurer of internationally recognized responsibility and standing specializing in aircraft insurance, as is reasonably acceptable to and approved by Lessor.

"Approved Maintenance Provider" shall mean: (i) with respect to any scheduled maintenance, modification, or alteration to the Aircraft, Lessee, or any other Person which is FAA approved maintenance facility, and which is reasonably acceptable to Lessor; and (ii) with respect to any other required maintenance hereunder, any other Person which is an FAA approved maintenance facility.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which banking institutions in Florida, Florida are authorized or required by law to be closed.

"Cape Town Convention" shall mean, collectively, the Protocol and the Convention.

"Casualty Occurrence" shall mean any of the following events with respect to the Aircraft, Airframe or an Engine: (a) loss of such property or its use due to theft or disappearance (including hijacking) for a period in excess of ninety (90) consecutive days, or destruction, damage beyond economic repair, or rendition of such property permanently unfit for normal use by Lessee for any reason whatsoever; (b) any damage to such property which results in an insurance settlement with respect to such property on the basis of a total loss or on the basis of a compromised or constructive total loss; (c) the condemnation, confiscation, appropriation or seizure of, or requisition of title to, such property; or (d) the occurrence of any event described in Section 6.1(b)(iv) hereof. A Casualty Occurrence with respect to the Airframe shall constitute a Casualty Occurrence with respect to the Aircraft.

"Component Programs" means, collectively, the Engine Maintenance Program, , the Honeywell HAPP, and the Rockwell CASP.

"Component Programs Amount" means (i) the amount equal to the sum of the outstanding amounts as of the date hereof owed with respect to any of the Component Programs; and (ii) any amounts owed with respect to any of the Component Programs during the Term.

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

"Convention" shall mean the official English language text of the Convention on International Interests in Mobile Equipment, adopted on 16 November 2001 at a diplomatic conference held in Cape Town, South Africa, as the same may be amended or modified from time to time.

"Cycle" shall mean one take-off and landing of the Aircraft.

"Default" shall mean an event which would constitute an Event of Default but for the lapse of time or the giving of notice or both.

"Delivery Condition" shall mean the requirements set forth in Section 3.3 hereof.

"Delivery Date" shall mean the date of Lease Supplement No. 1.

"Delivery Location" shall mean the location specified in Exhibit C hereto for the delivery of the Aircraft by Lessor to Lessee.

"Delivery Time" shall mean the time specified in Lease Supplement No. 1 as the time on the Delivery Date when the delivery of the Aircraft from Lessor to Lessee is completed.

"Dollars or $" shall mean lawful currency of the United States of America.

"DOT" shall mean the United States Department of Transportation or any successor thereto.

"Engine" shall mean each aircraft engine identified as to manufacturer, type and manufacturer serial number in Exhibit A hereto, together in each case with any and all Parts incorporated or installed in or attached thereto and any and all Parts removed therefrom so long as title thereto remains vested in Lessor in accordance with the terms of Section 9 hereof after removal from such Engine.

"Engine Maintenance Program" shall mean the Rolls-Royce Corporate Care on Engines Program.

"Estimated Delivery Date" shall mean the date specified on Exhibit C hereto.

"Event of Default" shall mean the occurrence of any of the events specified in Section 16 hereof.

"Excess Cycles Payment" has the meaning set forth in Section 17.1 hereof.

"Excess Flight Hours Payment" has the meaning set forth in Section 17.1 hereof.

"FAA" shall mean the Federal Aviation Administration of the United States Department of Transportation or any successor thereto.

"FAR" shall mean the Federal Aviation Regulations promulgated under the Federal Aviation Act, as amended and supplemented from time to time.

"Federal Aviation Act" shall mean 49 U.S.C. §40101 et. seq., as amended and as in effect on the date of this Lease, or any successor or substituted U.S. legislation at the time in effect and applicable.

3

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

"Flight Hour" shall mean each hour or part thereof elapsing from the moment the wheels of the Aircraft leave the ground on take-off until the wheels of the Aircraft next touch the ground.

"Governmental Entity" shall mean and include: (i) DOT; (ii) the FAA; (iii) any national, state, or local government (whether domestic or foreign), any political subdivision thereof or local jurisdiction therein; (iv) any board, commission, department, division, organ, instrumentality, court or agency of any entity described in (i), (ii) or (iii) above, however constituted; and (v) any association, organization or institution of which any entity described in (iii) or (iv) above is a member or to whose jurisdiction any such entity is subject or in whose activities any such entity is a participant but only (except for purposes of defining "Applicable Law" above) to the extent that any entity described in (i) through (v) above has jurisdiction over this Lease, the Operative Agreements or the Aircraft and its operations.

"International Interest" shall mean an "International Interest" as defined in the Protocol.

"International Registry" shall mean the international registry as defined in and maintained pursuant to the Convention.

"Lease Agreement, this Lease Agreement, this Lease, this Agreement, herein, hereunder" or other like words shall mean this Lease and all Exhibits, Lease Supplements, amendments or modifications hereto or thereto from time to time entered into.

"Lease Identification" shall mean a placard in the form set forth in Exhibit C hereto.

"Lease Supplement" shall mean Lease Supplement No. 1, substantially in the form of Exhibit D hereto.

"Home Base" shall mean the hangar facility located at Phoenix-Goodyear Airport [KGYR] in Goodyear, Arizona and or FT Lauderdale, Executive Airport

"Lessor's Estate" shall mean all estate, right, title and interest of Lessor in and to the Aircraft, the Lease, the Lease Supplement, any bill of sale, any warranty with respect to the Airframe or the Engines, all amounts of the Basic Rent and Supplemental Rent, including, without limitation, insurance proceeds and requisition, indemnity or other payments of any kind for or with respect to the Aircraft.

"Lessor's Liens" shall mean Liens on the Aircraft or Lessor's Estate arising as a result of: (i) claims against Lessor or Lessor's Estate not related to the transactions contemplated by this Lease; or (ii) acts or omissions of Lessor, not contemplated and expressly permitted under this Lease; or (iii) Taxes imposed against Lessor, Lessor's Estate, or the Aircraft which are not indemnified against by Lessee pursuant to Section 10 hereof; or (iv) claims against Lessor, Lessor's Estate or the Aircraft arising out of the voluntary transfer by Lessor of all or any part of its interests in Lessor's Estate, the Aircraft or this Lease, other than a transfer pursuant to Sections 11 or 18 hereof.

"Lien" shall mean any mortgage, pledge, lien, charge, encumbrance, hypothecation, lease, exercise of rights, security interest or claim (including any imposed with respect to any Taxes, or

4

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

any airport fees, landing fees, navigation charges or related charges) and resulting from any act or omission of Lessee and effecting Lessor's Estate, the Aircraft, or this Lease.

"LLP" means any Part that has a predetermined life limit as mandated by the Manufacturer, Engine Manufacturer or any applicable Governmental Entity which requires any such part to be discarded upon reaching such life limit.

"Maintenance Program" shall mean the manufacturer's FAA approved maintenance program for Gulfstream Aerospace G-V aircraft. Upon request by Lessor, Lessee shall immediately provide a copy of and/or any information concerning such Maintenance Program to Lessor which shall only be used or disseminated by Lessor for purposes related to this Lease.

"Management Company" shall mean Gryphon Air, LLC dba Aircraft Transport Service, or any other Part 135 operator identified by Lessee and approved by Lessor in its sole discretion.

"Operating Certificate" shall mean the Air Carrier Certificate issued by the FAA to (i) the Lessee, or (ii) the Management Company.

"Operative Agreements" shall mean this Lease, any Lease Supplement, and any other documents and agreements executed and delivered by Lessor, Lessee, or any other Person in furtherance of the transactions contemplated hereby.

"Parts" shall mean all appliances, components, parts, instruments, appurtenances, avionics, accessories, furnishings, auxiliary power units, and other equipment of whatever nature (other than a complete Engine or engine), which may now or from time to time be incorporated or installed in or attached to the Airframe or an Engine (including any hush kits). Except as otherwise set forth herein, only at such time as a replacement part shall be substituted for a Part in accordance with Section 9 hereof, shall the Part so replaced cease to be a Part hereunder.

"Permitted Lien" shall mean: (i) any Lien for Taxes which are either not assessed or, if assessed, are not yet due and payable or are being contested in good faith by appropriate proceedings for the payment of which adequate reserves have been provided; or (ii) any undetermined or inchoate Lien of a repairer, carrier, hangarkeeper, material supplier or other similar Lien arising in the ordinary course of business in respect of obligations which are not overdue or which have been adequately bonded or are being contested in good faith by appropriate proceedings for which adequate reserves have been provided; provided that (in the case of both (i) and (ii)) such proceedings, or the continued existence of such Lien, do not involve any material danger of the sale, forfeiture or loss of the Aircraft; or (iii) the respective rights of the parties to the Operative Agreements as set forth therein, and any Liens expressly permitted thereby.

"Person" shall mean and include any individual, corporation, company, limited liability company, partnership, firm, joint stock company, joint venture, trust, estate, unincorporated organization, association or Governmental Entity.

"Protocol" shall mean the official English language text of the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment, adopted on 16 November 2001 at a diplomatic conference held in Cape Town, as the same may be amended or modified from time to time.

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

"Rent" shall mean Basic Rent and Supplemental Rent, collectively.

"Rent Period" shall mean each calendar month during the Term; provided, however, if the Delivery Date is not the first day of a calendar month, the first Rent Period shall be the period commencing on the Delivery Date and ending on the last day of the calendar month in which the Delivery Date occurs. and the last Rent Period shall be the period commencing on the first calendar day of the month for such Rent Period and ending on the Expiration Date.

"Return Conditions" shall mean the return conditions for the Aircraft specified in Exhibit E hereof.

"Return Occasion" shall mean any return of possession of the Aircraft to Lessor upon the Expiration Date, or upon Lessor taking possession of the Aircraft pursuant to Section 17 hereof.

"Routine Engine Maintenance" shall mean the performance of normal routine and non-routine line maintenance which can be performed while an Engine is installed on the Airframe and any other maintenance, inspection, repair or overhaul resulting from foreign object damage or abuse or misuse.

"Service Bulletins" or SBs shall mean all mandatory service bulletins issued by the Airframe, Engine or any Parts manufacturer with respect to the Aircraft.

"Supplemental Rent" shall mean any and all amounts, liabilities and obligations (other than the Basic Rent) which Lessee assumes or agrees to pay hereunder to Lessor, including without limitation: (i) any payment of Casualty Value; (ii) any payment of indemnity required by Sections 10 or 13 hereof; (iii) to the extent permitted by Applicable Law, interest at the Interest Rate (all computations of interest under this Lease to be made on the basis of a three hundred sixty (360) day year for the actual number of days elapsed) calculated on any part of any on any Supplemental Rent not paid when due hereunder until the same is paid; (iv) the Use Payments; and (v) the Security Deposit.

"Taxes" shall mean any and all sales, use, business, gross income, personal property, transfer, fuel, leasing, occupational, value added, excess profits, excise, gross receipts, franchise, stamp, ad valorem, income, levies, imposts, customs, import and export, withholdings, goods and services, or other taxes, excises, or duties of any nature whatsoever, together with any penalties, fines, charges or interest thereon.

"Term" shall mean the period commencing on the Delivery Date and ending on (i) the 36th month anniversary of the Delivery Date; or (ii) the Expiration Date.

"Basic Rent Payment Date" shall mean the first day of each Rent Period.

The terms, Basic Rent, Casualty Value, Delivery Location, Engine Manufacturer, Estimated Delivery Date, Expiration Date, Indemnitees, Inspection and Delivery Procedure, Interest Rate, Lease Identification, Lessee's Address, Lessor's Address, Manufacturer, Payment Location,, Security Deposit, shall have the meanings set forth in Exhibit C hereto.

6

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

## SECTION 2 LEASE AND CONDITIONS

2.1  Lessor hereby agrees to lease the Aircraft to Lessee, and Lessee hereby agrees to lease the Aircraft from Lessor, subject to and in accordance with the terms hereof, as supplemented by the Lease Supplement.  At all times during the term of this Lease, the Aircraft shall be under the exclusive operational control of Lessee, and Lessee will be responsible for airworthiness and maintenance.  The Lessor acknowledges that, subject to the Lessor's rights as provided in Sections 3.3, 16, and 17, the Aircraft shall be in the legal custody and control of the Lessee during the Term of the Lease and that the Lessor will not provide, directly or indirectly, any flight crew member to operate the Aircraft for the duration of the Lease.

2.2  Lessor shall deliver the Aircraft hereunder to Lessee upon the receipt by Lessor of the following items on or before the Delivery Date (or such later date as specified below), all of which shall be reasonably satisfactory to Lessor in form and substance, and duly authorized and executed:

(a)  this Lease and the Lease Supplement in the form of Exhibit D hereto, along with each of the other Operative Agreements;

(b)  the Security Deposit;

(c)  the payment of the Basic Rent for the first Rent Period;

(d)  a copy of Operating Certificate and any other documentation or authority pursuant to which the Aircraft will be operated by Lessee or the Management Company retained by Lessee, together with evidence that the same is valid and in compliance with the requirements of the FAA;

(e)  an opinion or report, dated the Delivery Date, signed by an Approved Insurance Broker as to the due compliance with the insurance provisions of Section 12 hereof with respect to the Aircraft in form and substance reasonably satisfactory to Lessor;

(f)  certificates of an Approved Insurance Broker evidencing the insurance as required by Section 12 hereof in form and substance reasonably satisfactory to Lessor;

(g)  three (3) original, executed counterparts of this Lease and the Lease Supplement that have been pre-positioned with the Escrow Agent;

(h)  confirmation that Lessee is registered as a Transacting User Entity (as defined in the Cape Town Convention) and has granted an authorization to the Escrow Agent, acting as a Professional User Entity (as defined in the Cape Town Convention) to register an International Interest in favor of Lessor with respect to the Airframe and the Engines; and

(i)  such other documents and matters incident to any of the foregoing as Lessor may reasonably request.

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

2.3     Subject to and in accordance with the terms of this Lease, Lessee shall accept the Aircraft hereunder from Lessor upon the receipt by Lessee of tender of the Aircraft and the Aircraft Documents at Delivery.

## SECTION 3  DELIVERY AND ACCEPTANCE; DELIVERY CONDITION; EFFECTIVE DATE; TERM

3.1     Delivery.  The Aircraft will become available for delivery on or about the Estimated Delivery Date.  Lessee has inspected the Aircraft and the Aircraft is in a condition acceptable to Lessee for purposes of this Lease.

3.2     Place of Delivery and Acceptance.  Subject to and in accordance with the terms of this Lease, the Aircraft shall be delivered to and accepted by Lessee at the Delivery Location set forth in Exhibit C.

3.3     Delivery Condition. It shall be a condition precedent to the Lease of the Aircraft by Lessee, that the Aircraft shall be in the Delivery Condition set forth in Section 3.3(a) through 3.1(j) at the time of Delivery.

     (a)     In AS IS WHERE IS condition, and with all faults.

     (b)     With the Component Programs in effect.

     (c)     Enrolled on a computerized aircraft maintenance tracking system.

     (d)     With the Aircraft Documents.

3.4     Casualty to the Aircraft Preceding Delivery.  In the event of a Casualty Occurrence with respect to the Aircraft prior to the execution of Lease Supplement No. 1, Lessor shall promptly notify Lessee in writing and the obligation of Lessor to make the Aircraft available to Lessee, and the obligation of Lessee to lease the Aircraft from Lessor, shall terminate.  In such event, Lessor shall promptly return to Lessee any the difference between any monies paid by Lessee to Lessor hereunder, including the Security Deposit less the costs and expenses payable by Lessee pursuant Section 19.8 hereof. Notwithstanding anything to the contrary contained in this Lease or any other Operative Agreement, neither party shall be liable for any delay in delivery of the Aircraft, or failure to deliver the Aircraft, caused by acts of God, (including but not limited to fire, floods, earthquakes or other natural disasters) or caused by acts of any Governmental Entity.

3.5     Acceptance of Aircraft.  The Aircraft to be leased hereunder shall be delivered to Lessee in "AS IS, WHERE IS" and "WITH ALL FAULTS" condition and SUBJECT TO EACH AND EVERY DISCLAIMER OF WARRANTY AND REPRESENTATION AS SET FORTH IN SECTION 5.1 HEREOF.  Upon tender of delivery of the Aircraft by Lessor to Lessee in compliance with Lessor's obligations pursuant to this Lease, Lessee shall immediately accept the Aircraft, and shall indicate and confirm its acceptance of the Aircraft by executing and delivering Lease Supplement No. 1 in the form set forth in Exhibit D hereto.

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

3.6    Effective Date and Term of Lease.  This Lease shall commence on the Delivery Date and continue until the Expiration Date.  Notwithstanding the foregoing, this Lease may be earlier terminated by Lessor pursuant to the provisions of Sections 3.4, 11 or 16 hereof.

## SECTION 4   RENT; PAYMENT; SECURITY DEPOSIT

4.1    Rent.  Lessee covenants and agrees to pay to Lessor, or its permitted assigns or whoever shall be entitled thereto, the following as Rent:

(a)    Basic Rent as set forth in Exhibit C hereto is due and owing in advance on the first day of each Rent Period; and

(b)    any and all Supplemental Rent as the same becomes due, including without limitation any Excess Hours Payment or Excess Cycles Payment, payable in accordance with Section 6.1(c) hereof.

4.2    Place and Method of Payment.  The Basic Rent and Supplemental Rent payable under this Lease shall be paid in U.S. Dollars, by wire transfer of immediately available funds at the Payment Location specified on Exhibit C hereto, or at such other location as Lessor shall designate in writing to Lessee.  Each payment of Rent shall be made by the Lessee in immediately available funds prior to 12:00 o'clock noon, Miami, Florida time, on the scheduled date when such payment shall be due.

4.3    Non-Business Day; Date of Receipt.

(a)    If any payment of Rent falls due hereunder on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

(b)    All payments shall be considered to have been made on the date on which they are received at the Payment Location in the manner provided in Section 4.2.

4.4    Interest on Overdue Amounts.   If Lessee fails to pay any sum when due hereunder, Lessee shall pay interest thereon at the Interest Rate as Supplemental Rent from the date such sum fell due until the date of payment thereof.  Such interest shall be payable by Lessee to Lessor on demand, shall be calculated on the basis of a year of 360 days and the actual number of days elapsed in the period during which the sum is outstanding and shall be compounded monthly during such period.

4.5    Prohibition Against Setoff, Counterclaim, Etc. This Lease is a net lease. Lessee's obligation to pay all Rent hereunder shall be absolute and unconditional and shall not be affected or reduced by any circumstances, including, without limitation: (i) any setoff, counterclaim, recoupment, defense or other right which Lessee may have against Lessor, the Manufacturer, any seller of or Person providing services with respect to the Aircraft or any other Person, for any reason whatsoever; (ii) any defect in the airworthiness or registration  under Applicable Law, or

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

any condition, design, operation, merchantability or fitness for use of, or any damage to or loss or destruction of, the Aircraft, or any interruption or cessation in the use or possession thereof by Lessee for any reason whatsoever, whether arising out of or related to an act or omission of Lessee, or any other Person; (iii) any Liens, Lessor Liens, or Permitted Liens with respect to the Aircraft; (iv) the invalidity or unenforceability or lack of due authorization or other infirmity of this Lease or any absence of right, power or authority of Lessee to enter into this Lease; (v) any insolvency, bankruptcy, reorganization or similar proceedings by or against Lessor or Lessee or any other Person; (vi) any other circumstance or happening of any nature whatsoever, whether or not similar to any of the foregoing; or (vii) any Taxes (with respect to which Lessee's obligations shall be as set forth in Section 10 hereof); it being the express intention of Lessor and Lessee that all Rent payable hereunder shall be payable in all events, unless the obligation to pay the same shall be terminated pursuant to the express provisions of this Lease.

4.6    Security Deposit.

(a)    On or prior to the date hereof, Lessee has deposited or will deposit with the Lessor an amount equal to the Security Deposit. The Lessor shall hold the Security Deposit as security for the timely and faithful performance by Lessee of all of Lessee's obligations, and Lessee hereby grants Lessor a continuing security interest in the Security Deposit. Lessee agrees to execute and file with the appropriate Governmental Authorities any and all documents necessary or reasonably requested by Lessor to evidence and perfect such security interest in favor of Lessor. If Lessee fails to pay Rent hereunder or to pay any other sums due or to perform any of the other terms and provisions of this Lease or an Event of Default has otherwise occurred and is continuing hereunder, in addition to all other rights Lessor shall have hereunder and under the any applicable Law, Lessor may use, apply or retain all or any portion of the Security Deposit in full or partial payment for sums due to Lessor by Lessee under the terms and conditions of this Lease. If Lessor uses or applies all or any portion of such Security Deposit, such application shall not be deemed a cure of any Default, and Lessee shall within five (5) days after written demand therefor deposit with Lessor in cash an amount sufficient to fully restore the Security Deposit to its original sum and the failure of Lessee to do so shall be a material breach of this Lease by Lessee.

(b)    Provided no Event of Default has occurred and is continuing under this Lease, the Security Deposit shall be returned to Lessee upon Lessee's return of the Aircraft in compliance with the Return Conditions.

(c)    The Lessor need not maintain the Security Deposit in a segregated account and may commingle the Security Deposit with Lessor's other funds. Interest, if any, which accrues on the Security Deposit, shall be for Lessor's account.

## SECTION 5   REPRESENTATIONS AND WARRANTIES

5.1    DISCLAIMER.    LESSOR LEASES AND LESSEE EXPRESSLY AGREES TO TAKE THE AIRCRAFT "AS IS," "WHERE IS," WITH ALL FAULTS. LESSOR HAS NOT MADE AND SHALL NOT BE DEEMED TO HAVE MADE (WHETHER BY VIRTUE

10

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

OF HAVING LEASED THE AIRCRAFT UNDER THIS LEASE, OR HAVING ACQUIRED THE AIRCRAFT, OR HAVING DONE OR FAILED TO DO ANY ACT, OR HAVING ACQUIRED OR FAILED TO ACQUIRE ANY STATUS UNDER OR IN RELATION TO THIS LEASE OR OTHERWISE) AND LESSOR HEREBY SPECIFICALLY DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED (EXCEPT AS HEREIN BELOW PROVIDED IN THIS SECTION 5.1), AS TO AIRWORTHINESS, SERVICEABILITY, CONDITION, DESIGN, OPERATION, MERCHANTABILITY, FREEDOM FROM CLAIMS OF INFRINGEMENT OR THE LIKE, OR FITNESS FOR USE FOR A PARTICULAR PURPOSE OF THE AIRCRAFT, THE ENGINES OR ANY PART, OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF THE AIRCRAFT, THE ENGINES OR ANY PART, THE ABSENCE THEREFROM OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE, AS TO THE COMPLETENESS AND VERACITY OF THE AIRCRAFT DOCUMENTS, OR AS TO ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED (INCLUDING ANY IMPLIED WARRANTY ARISING FROM A COURSE OF PERFORMANCE OR DEALING OR USAGE OF TRADE), WITH RESPECT TO THE AIRCRAFT AND/OR THE AIRCRAFT DOCUMENTS; AND LESSEE HEREBY WAIVES, RELEASES, RENOUNCES AND DISCLAIMS EXPECTATION OF OR RELIANCE UPON ANY SUCH WARRANTY OR WARRANTIES. LESSOR SHALL NOT HAVE ANY RESPONSIBILITY OR LIABILITY WHATSOEVER TO LESSEE OR ANY OTHER PERSON, WHETHER ARISING IN CONTRACT OR TORT, OUT OF ANY NEGLIGENCE OR STRICT LIABILITY OF LESSOR OR OTHERWISE, FOR: (i) ANY LIABILITY, LOSS OR DAMAGE CAUSED OR ALLEGED TO BE CAUSED, DIRECTLY OR INDIRECTLY, BY THE AIRCRAFT, THE ENGINES OR ANY PART OR BY ANY INADEQUACY THEREOF OR DEFICIENCY OR DEFECT THEREIN OR BY ANY OTHER CIRCUMSTANCE IN CONNECTION THEREWITH; (ii) THE USE, OPERATION OR PERFORMANCE OF THE AIRCRAFT, THE ENGINES OR ANY PART OR ANY RISKS RELATING THERETO; (iii) ANY INTERRUPTION OF SERVICE, LOSS OF BUSINESS, ANY ANTICIPATED PROFITS, ANY INCIDENTAL DAMAGES OR ANY CONSEQUENTIAL DAMAGES; OR (iv) THE DELIVERY, OPERATION, SERVICING, MAINTENANCE, REPAIR, IMPROVEMENT OR REPLACEMENT OF THE AIRCRAFT. THE WARRANTIES AND REPRESENTATIONS SET FORTH IN THIS SECTION 5.1 ARE EXCLUSIVE AND IN LIEU OF ALL OTHER REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, AND LESSOR SHALL NOT BE DEEMED TO HAVE MADE ANY OTHER WARRANTIES, EXCEPT THAT:

(a)     Lessor warrants that at the Delivery Time on the Delivery Date, Lessor owns the Aircraft, and the Aircraft shall be free and clear of any and all Liens, other than Lessor's Liens;

(b)     Lessor further represents and warrants that the making and performance by Lessor of this Lease has been duly authorized by all necessary action on the part of Lessor and will not violate any provision of its articles of incorporation or by-laws or other constitutional documents and neither the execution and delivery hereof nor the consummation of the transactions contemplated hereby nor compliance by Lessee with any of the terms and provisions hereof will, contravene any Applicable Law;

11

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

(c)    Lessor further represents and warrants that this Lease has been duly executed and delivered by Lessor, and that this Lease and the Lease Supplement and the other Operative Documents, when executed and delivered hereunder by Lessor constitute legal, valid and binding obligations of Lessor, enforceable in accordance with their respective terms except as may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and, to the extent that certain remedies require or may require enforcement by a court of equity, by such principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) as a court having jurisdiction may impose and by laws which may affect some of such remedies;

(d)    Neither Lessor nor any of its shareholders, members, officers or directors is an individual, entity or organization identified on (A) any Office of Foreign Assets Control ("OFAC") "watch list", including, without limitation, OFAC's list of Specially Designated Nationals and Blocked Persons, or (B) any Federal Bureau of Investigation "watch list" or Bureau of Industry and Security list of unverified persons or denied persons, and in each case it is not an affiliate of any kind with such an individual, entity or organization; (iv) Lessor does not have a shell bank or offshore bank; and (v) Lessor is not a person resident in, or whose funds are transferred from or through, or has operations in, a jurisdiction identified as non-cooperative by the Financial Action Task Force or sanctioned by OFAC; and

(e)    Lessor represents and warrants that it has full legal and beneficial title to the Aircraft is a "citizen of the United States" within the meaning of 49 U.S.C. § 40102(a)(15).

5.2    Manufacturers' Warranties.  So long as Lessee is not in Default and Lessor has not terminated this Lease, Lessor hereby assigns to Lessee such rights as Lessor may have under any warranty, express or implied, with respect to the Aircraft and the Engines made by the Manufacturer, the Engine Manufacturer, or any other Person (including any Approved Maintenance Provider), to the extent that the same exist or may be assigned by Lessor or otherwise made available to Lessee; and that any monies recovered pursuant to such warranties which are suffered during the Term shall be applied to correct or cure any defect or deficiency of the Aircraft, and the balance of any such monies shall be paid over to Lessee to reimburse it for any amounts paid by it to correct or cure such defect of deficiency during the Term which were properly reimbursable under such warranty; provided, however, that upon the occurrence of a Default or an Event of Default, all such rights shall immediately revert to, and all such monies shall be paid over to, Lessor including all claims thereunder, whether or not perfected. Upon the cure of any such Default or Event of Default, and provided that Lessor is not then pursuing any other remedies in respect thereof, then such rights shall revert to Lessee.

5.3    Lessee's Representations and Warranties.  Lessee hereby represents and warrants the following, each of which shall survive the execution and delivery of this Lease, and the delivery by Lessor and acceptance by Lessee of the Aircraft:

(a)    Lessee is a Florida limited liability company duly formed and validly existing under the laws of the state of Florida , and having its offices at 4285 SW Martin Highway, Palm City, FL 34990, and has the full power and authority to carry on its business as

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

presently conducted and to perform its obligations under this Lease and each of the Operative Agreements to which Lessee is a party;

(b)    this Lease and each of the Operative Agreements to which Lessee is a party have been duly authorized by all necessary action on the part of Lessee, do not require any approval of stockholders of Lessee, and neither the execution and delivery hereof nor the consummation of the transactions contemplated hereby nor compliance by Lessee with any of the terms and provisions hereof will, contravene any Applicable Law or result in any breach of, or constitute any default under, or result in the creation of any Lien upon any property of Lessee under Lessee's constitutive documents or any credit agreement or instrument or other agreement or instrument to which Lessee is a party or by which Lessee or its properties or assets are bound or affected;

(c)    no consent, approval or authorization of, or notice to, any Governmental Entity having jurisdiction with respect to the execution, delivery or performance by Lessee of this Lease, and each of the Operative Agreements to which Lessee is a party (including all monetary and other obligations hereunder or thereunder) is required for Lessee to execute and deliver this Lease, and to perform the transactions contemplated hereby;

(d)    this Lease has been duly executed and delivered by Lessee, and the Lease, the Lease Supplement and the other Operative Agreements, when executed and delivered by Lessee, constitute legal, valid and binding obligations of Lessee, enforceable in accordance with their respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and, to the extent that certain remedies require or may require enforcement by a court of equity, by such principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) as a court having jurisdiction may impose and by laws which may affect some of such remedies;

(e)    there are no suits or proceedings pending or, to the knowledge of Lessee, threatened in any court or before any Governmental Entity against or affecting Lessee which would, if adversely determined, have a materially adverse effect on the current business or financial condition of Lessee or Lessee's ability to perform its obligations under any of the Operative Agreements;

(f)    except for the registration on the aircraft registry maintained by the FAA and the placing on the Aircraft and on each Engine of the plates containing the legends referred to in Section 6.6, the filing for recordation with FAA of this Lease, filing of financing statement pursuant to the provisions of the Uniform Commercial Code in effect in the State of Florida, the registration of an International Interest on the International Registry and the execution and filing of any precautionary filings as are requested by Lessor, no further filing or recording of this Lease or of any other document and no further action is necessary under the Laws of any Governmental Entity in order to fully protect and establish Lessor's title to the Aircraft as against Lessee or any third party;

13

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

(g)     except for the rights of Lessee conferred by this Lease, Lessee shall not have, or claim to have, any other interest in the Aircraft or make any demands against Lessor in respect thereof;

(h)     the Maintenance Program complies with all FAA requirements;

(i)     Lessee shall operate the Aircraft or cause the Management Company to operate the Aircraft in accordance with all applicable rules and regulations, the Management Company has satisfied all of the requirements of and is in good standing with the FAA and the DOT, and has complied with and satisfied all requirements of the FAA and/or DOT, as applicable, so as to enable it to fulfill its obligations hereunder, and to otherwise lawfully operate, possess, use and maintain the Aircraft; and

(j)     Lessee or the Management Company currently possesses and will continue to maintain all required and necessary economic and technical competency authority from all Governmental Entities having authority over those jurisdictions to which Lessee and the Management Company is presently operating aircraft and to which Lessee and the Management Company will operate the Aircraft, and will further obtain any additional authorities required during the Term of the Lease from the Governmental Entities having authority over those jurisdictions to which the Aircraft may be operated prior to the Aircraft actually operating in such jurisdictions.

(k)     all of the written information that Lessee has provided in connection with this Lease was true, correct and complete at the time it was given; (ii) Lessee is entering into this Lease and the transactions contemplated hereby solely for its own account, risk and beneficial interest and not for the account or beneficial interest of any third party; (iii) neither Lessee nor any of its shareholders, members, officers or directors is an individual, entity or organization identified on (A) any Office of Foreign Assets Control ("OFAC") "watch list", including, without limitation, OFAC's list of Specially Designated Nationals and Blocked Persons, or (B) any Federal Bureau of Investigation "watch list" or Bureau of Industry and Security list of unverified persons or denied persons, and in each case it is not an affiliate of any kind with such an individual, entity or organization; (iv) Lessee does not have a shell bank or offshore bank; and (v) Lessee is not a person resident in, or whose funds are transferred from or through, or has operations in, a jurisdiction identified as non-cooperative by the Financial Action Task Force or sanctioned by OFAC.

## SECTION 6   POSSESSION, USE, OPERATION AND MAINTENANCE

6.1     Possession and Use.

(a)     Sublease, Assignment and Transfer. Lessee hereby covenants and agrees that, without the prior written consent of Lessor (which consent Lessor may withhold in its sole discretion), Lessee will not, and hereby acknowledges and confirms that it has no right to, assign this Lease or sublease or transfer possession of the Aircraft, the Airframe or an Engine, or install an Engine or permit an Engine to be installed on any airframe other than the Airframe, provided, however, that so long as no Default or Event of Default shall have occurred and be continuing

14

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

and as long as the action to be taken shall not affect the registration of, Lessor's title in and to, the Aircraft and so long as all necessary approvals of each Governmental Entity having jurisdiction over Lessee, and its operations, have been obtained, then Lessee may:

(i)    without the prior written consent of Lessor, deliver the Aircraft to the Management Company

(ii)    without the prior written consent of Lessor, deliver possession of the Aircraft, the Airframe, an Engine, or any Part thereof, to the manufacturer thereof for testing or other similar purposes or to any Approved Maintenance Provider for inspection, service, repair, maintenance, testing or overhaul work on the Aircraft, the Airframe, an  Engine or any Part thereof to the extent required or permitted by the terms of Section 6.3 and 9 hereof; and

(iii)   without the prior written consent of Lessor, install an engine (other than an Engine) on the Airframe or a part (other than a Part) on the Aircraft, provided that such installation does not create, or permit to exist, any Liens on the Aircraft except those of the type permitted under Section 14 hereof and those which apply only to such engine or part which has been installed on the Aircraft.

(b)    Certain Limitations on Transfers.  With respect to any transfer pursuant to Section 6.1(a) hereof:

(i)    the rights of any transferee that received possession by reason of a transfer permitted by this Section 6.1 shall be subject and subordinate to all of the terms of this Lease;

(ii)    Lessee shall remain primarily liable hereunder for the performance of all terms of this Lease to the same extent as if such transfer had not occurred;

(iii)   no relinquishment of possession of the Aircraft, the Airframe or an Engine pursuant to the terms of this Section 6.1 shall in any way discharge or diminish any of Lessee's obligations to Lessor hereunder; and

(iv)   if any of the actions permitted under Section 6.1(a) shall result in the divestiture of Lessor's title in and to such Aircraft, Airframe, Engine or Part, then Lessee shall comply with Section 11 in respect thereof.

6.2    Lawful Insured Operations.  Throughout the Term, Lessee shall or shall cause the Management Company to ensure that the Aircraft will be used at all times in accordance with the laws, rules, regulations and ordinances of the United States, each of the states and municipalities thereof, in which the Aircraft may be operated, including, but not limited to those relating to intoxicating liquors, narcotics, or controlled substances, and shall conform with all laws, rules and regulations governing the Aircraft.  Lessee will not permit the Aircraft to be maintained, used or operated in violation of any Applicable Law or law of any Governmental Entity, or in

15

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

violation of any airworthiness certificate, or license or registration issued by any such authority, or contrary to the Manufacturer's operating manuals or instructions for the Aircraft. In the event that any Applicable Laws or manufacturer's mandatory service bulletins require alteration of the Aircraft, Lessee shall comply therewith at its sole cost and expense and shall maintain the same in proper condition for operation under all Applicable Laws. Lessee agrees not to operate or permit the Aircraft to be operated: (i) unless the Aircraft is covered by insurance as required by the provisions hereof, (ii) contrary to the terms of such insurance, or (iii) except in a configuration for flights for which Lessee is duly authorized. The Aircraft will be operated at all times only by Lessee's currently certified flight crew or the Management Company's currently certified flight crew (and Lessor shall not during the Term provide, directly or indirectly, any flight crew to operate the Aircraft) having the minimum qualifications required by and will be used only for the purposes and in the manner set forth in the insurance policy issued pursuant to the requirements of this Lease. Furthermore, Lessee agrees not to operate or locate the Aircraft or suffer or permit the Aircraft to be operated or located in any area excluded from coverage by any insurance policy issued pursuant to the requirements of this Lease.

6.3     Maintenance. Lessee, at its own cost and expense, shall:

(a)     perform or cause an Approved Maintenance Provider to perform all inspections, repair, maintenance, overhaul and testing, this shall exclude any Airworthiness Directives and/or Service Bulletins, which are issued on or after the Effective Date, which shall be the financial responsibility of the Lessor: (i) in compliance with all applicable FAA rules and regulations; (ii) in compliance with the Maintenance Program, (iii) in compliance with each of the Component Programs recommended maintenance programs, including aging aircraft, structural inspection and corrosion control programs; and (iv) in the same manner and with the same care as shall be the case with similar aircraft and engines owned or operated by or on behalf of Lessee without discrimination;

(b)     keep the Aircraft in such operating condition as is necessary to enable all certificates, licenses, permits and authorizations required for the use and operation of the Aircraft, the Engine and Parts, including the airworthiness certification of the Aircraft to be maintained at all times under applicable FAA regulations and any other Applicable Law, including, but not limited to any equipment modifications or installations required by the FAA;

(c)     maintain, in the English language, all records, logs and other materials required by, and in accordance with the requirements of Exhibit F hereto, and in a manner acceptable to the FAA and any other Governmental Entity having jurisdiction over the Aircraft and its operation;

(d)     upon request, furnish to Lessor, on or before the tenth day of each calendar month, a report for the immediately preceding calendar month in substantially the form of Exhibit G hereto which specifies, among other things: (i) the flight hours/cycles operated for the Airframe and Engines during such immediately preceding calendar month; and (ii) the flight hours/cycles operated for the Engine (noting its location) during such immediately preceding calendar month;

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

(e)  maintain the enrollment of each Engine in the Engine Maintenance Program;

(f)  maintain each Engine in accordance with the Maintenance Program including the performance of all Routine Engine Maintenance and all non-routine maintenance work in order to maintain each Engine in as good operating condition as when delivered, reasonable wear and tear excepted;

(g)  Lessee shall not modify any material provision of the Maintenance Program or any of the Component Programs, including but not limited to extending any service intervals, without first obtaining the Lessor's prior written consent, which consent shall not be unreasonably withheld; and

(h)  Pay the Component Programs Amount.

6.4  [Intentionally Omitted]

6.5  Registration.  At all times during the Term, Lessor shall cause the Aircraft to remain registered in the United States of America in accordance with Applicable Law reflecting, to the extent possible, that Lessor is the owner and lessor hereunder, and accomplish all such other filings as are required by Lessor, FAA and Applicable Law and any other government or Governmental Entity having jurisdiction over Lessee, and the Aircraft and its operation.  If requested by Lessor, Lessee shall use its reasonable efforts to assist Lessor in maintaining the registration of the Aircraft in Lessor's name.

6.6  Lease Identification.  Upon delivery of the Aircraft, Lessee agrees to place the Lease Identification in the cockpit in a location reasonably adjacent to, and not less prominent than, the airworthiness certificate for the Aircraft and to place the Lease Identification on each Engine.  Lessee agrees to make such changes to the Lease Identification as Lessor may reasonably request in writing from time to time.

6.7  Maintenance Program.  Lessee shall not modify any material provision of the Maintenance Program, including but not limited to extending  any service intervals, without first obtaining the Lessor's  prior written consent, which consent shall not be unreasonably withheld.

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

## SECTION 7  LESSOR INSPECTION

7.1     Lessee shall permit Lessor, or a designee of Lessor, on two (2) days prior written notice to visit and inspect the Aircraft, its condition, use and operation, and the books, records and logs maintained and relating to the Aircraft, its flights and Lessee's maintenance procedures, at any reasonable time during normal business hours without interfering with the normal commercial operation of the Aircraft. Notwithstanding the foregoing, Lessor shall have the right to inspect the Aircraft at any time that a Default or an Event of Default has occurred and is continuing. Lessor shall have no duty to make any such inspection and shall not incur any liability or obligation by reason of not making any such inspection. Lessor's failure to object to any condition or procedure observed or observable in the course of an inspection hereunder shall not be deemed to waive or modify any of the terms of this Lease with respect to such condition or procedure.

## SECTION 8  COVENANTS OF LESSEE

In addition to and not in limitation of Lessee's other representations, warranties, covenants and agreements set forth elsewhere in this Lease, Lessee covenants and agrees that:

(a)  Maintenance of Company Existence.  During the Term of this Lease, Lessee will preserve and maintain its company existence and such of its rights, privileges, licenses and franchises in any jurisdiction where failure to obtain such licensing or qualification may have a material adverse effect upon Lessee and its business and its ability to perform hereunder.

(b)  Maintenance of Status.  Lessee is, and shall remain so long as it shall be Lessee under this Lease, duly qualified to operate and maintain the Aircraft under Applicable Law and in accordance with the requirements of this Agreement. Lessee will maintain, or cause the Management Company to maintain, in full force and effect during the Term of this Lease, a current operating certificate, air transport license and a current certificate of airworthiness for the type of operations conducted by Lessee, as the case may be, in accordance with Applicable Law and the requirements of the FAA and each of the transactions contemplated hereby and by the other Operative Agreements.

(c)  Payment of Taxes.  Lessee will promptly pay or cause to be paid all Taxes due and owing during the Term as provided in Section 10 hereof. On reasonable demand from time to time, shall provide written evidence to Lessor that it has paid, or set aside adequate reserves to pay, any Taxes so imposed.

(d)  Place of Business.  Lessee will provide to Lessor at least thirty (30) days prior written notice of any change in its principal place of business or chief executive office if there is more than one place of business.

(e)  Notice of Default.  Immediately after Lessee or any of its corporate officers obtains knowledge of a Default or an Event of Default hereunder or under any other Operative Agreement, Lessee shall immediately notify Lessor in writing of such Default or Event of

18

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

Default. In addition, Lessee shall provide immediate notice to Lessor if the police or any other authority seizes or impounds the Aircraft.

(f) Governmental Consents. Lessee, at its sole cost and expense, shall maintain in full force and effect all governmental consents, licenses, authorizations, approvals, declarations, filings and registrations obtained or effected in connection with this Lease, each Operative Agreement, and/or required by any Applicable Law or by any other Governmental Entity from time to time during the Term, and every document or instrument contemplated hereby or thereby and to take all such additional action as may be proper in connection herewith or therewith.

(g) No Liens. Lessee, at its sole cost and expense, shall at all times keep the Aircraft free and clear of Liens except as expressly permitted under Section 14 hereof.

(h) Licenses. Lessee will maintain and cause the Management Company to maintain in full force and effect during the Term of this Lease, any air transport license and a current certificate of airworthiness for the type of operations conducted by Lessee or the Management Company, in accordance with Applicable Law and each other Governmental Entity having jurisdiction over the Aircraft.

(i) Engine Maintenance Program. During the Term, Lessee shall be responsible for and shall pay (or cause to be paid) when due all fees and costs related to the Engine Maintenance Program.

(j) No Discrimination. Lessee shall not discriminate, and shall not amend or modify the Maintenance Program in any manner that would result in discrimination, in its maintenance and care, operation or any other conditions or obligations with respect to the Aircraft as between it and any other aircraft operated by Lessee. For the avoidance of doubt, the intent and scope of this covenant as it relates to Section 15 hereof and Lessee's redelivery of the Aircraft hereunder is to disallow the installation or removal of any Part or Engine solely to provide Lessee the benefit of a lower redelivery cost.

## SECTION 9  REPLACEMENT OF PARTS; ALTERATIONS; MODIFICATIONS AND ADDITIONS

9.1    Replacement of Parts. Lessee, at its own cost and expense will promptly replace or cause to be replaced by an Approved Maintenance Provider, or applicable vendor of the same, all Parts which may from time to time become worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use for any reason whatsoever. In addition, in the ordinary course of maintenance, service, repair, overhaul or testing, Lessee may, at its own cost and expense, cause to be removed any Parts, whether or not worn out, destroyed, damaged beyond repair or permanently rendered unfit for use, provided that Lessee shall immediately replace such Parts, at its own cost and expense. All replacement Parts (a) shall be free and clear of all Liens, other than Liens permitted by Section 14 hereof, (b) shall be in at least the same modification status and service bulletin accomplishment status, (c) shall be interchangeable as to form, fit and function, (d) shall have been overhauled, repaired and inspected by an FAA approved agency and shall bear FAA acceptable tags, and (e) shall be in as good an operating condition as, and have a value, utility and remaining useful life at least equal

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

to, the Parts replaced (assuming such replaced Parts were in the condition and repair in which they were required to be maintained by the terms hereof); provided, however, that Lessee shall replace each time controlled Part with a replacement Part that has not less than fifty per cent (50%) of the remaining time until the next overhaul or replacement and Lessee shall replace each LLP with a replacement LLP that has no less life remaining than the original LLP being replaced had on the Delivery Date. All replacement Parts shall have "back-to-birth" records and all historical records relating to such replacement Parts shall be maintained by Lessee in English, and in compliance with the requirements of the FAA.

All Parts which are at any time removed from the Aircraft shall remain the property of Lessor and subject to this Lease, no matter where located, until such time as such Parts shall be replaced by Parts which have been incorporated or installed in or attached to the Aircraft and which meet the requirements for replacement Parts specified above. Immediately upon any replacement Part becoming incorporated or installed in or attached to the Aircraft as above provided, (i) title to the removed Part shall thereupon vest in Lessee, free and clear of all rights of Lessor, (ii) title to such replacement Part shall thereupon vest solely in Lessor, free and clear or any and all Liens other than Lessor's Liens or Permitted Liens and (iii) such replacement Part shall become subject to this Lease and be deemed a Part for all purposes hereof to the same extent as the Part which it has replaced.

9.2   Alterations, Modifications and Additions. Subject to Section 9.3 below, Lessee, at its own cost and expense, shall make or cause to be made such alterations and modifications in and additions to the Aircraft, either Engine or Parts, as may be required from time to time to meet the applicable standards of the FAA, or to comply with any Applicable Law, rule, directive, bulletin, regulation or order of any Governmental Entity or in connection with any emergency repair. Title to all Parts incorporated or installed in or attached or added to the Aircraft as the result of such alteration, modification or addition shall vest immediately in Lessor and shall become subject to this Lease, without the necessity for any further act or transfer, document or notice, provided, however, that Lessee may remove such Parts prior to return of the Aircraft to Lessor on the Expiration Date if such removal does not damage or otherwise result in any diminution in value of the Aircraft, and provided further, however, that Lessee replaces and restores any Parts originally installed on the Aircraft as of the Delivery Date and which were removed by Lessee in connection with any such alteration, modification or addition. In no event shall Lessor bear any liability or cost as a result of any alteration, modification or addition to, or for any grounding or suspension of certification of the Aircraft, or for any loss of revenue arising therefrom.

9.3   Airworthiness Directives and Service Bulletins. The costs of complying with and otherwise accomplishing any Airworthiness Directive or Service Bulletin requiring the mandatory alteration and modification of Gulfstream Aerospace G-V aircraft including the Aircraft or the Engines shall be paid by, and such compliance shall be the sole responsibility of, Lessee. Lessor shall not bear any liability or cost for any alteration, modification or addition to, or for any grounding or suspension of certification of the Aircraft, or for any loss of revenue arising therefrom.

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

## SECTION 10   GENERAL TAX INDEMNITY

10.1     Indemnity. Lessee shall pay when due and indemnify and hold each Indemnitee harmless from and against any and from all Taxes imposed against any such Indemnitee, Lessee, the Aircraft or any interest therein or use thereof, as well as Taxes arising out of this Lease, and each other Operative Agreement, or based on or measured by, the payments of Rent and other amounts due hereunder or thereunder, the terms, covenants and conditions hereof and thereof, or the use, operation, maintenance, possession, condition, control, occupancy, servicing, installation, transportation, storage, substitution, recording, documentation, import and export of the Aircraft by Lessee in connection with its use and operation thereof, rental, lease, modification, location, repair, abandonment, replacement, delivery, registration, repossession, improvement, subleasing, manufacture, rental, settlement of any insurance claim, return or other disposition of the Aircraft or any Part thereof or interest therein regardless of the method of calculation; provided, however, that Lessee shall have no obligation to pay any of the following Taxes: (i) assessed by the federal government of the United States, or any state, or any foreign country or international taxing authority against the Indemnitees which are based upon or measured by their respective gross annual incomes, profits, gains, capital or net worth, or Taxes in lieu of any of the foregoing; (ii) Taxes attributable to any Indemnitee's gross negligence or willful misconduct; or (iii) Taxes imposed as a result of Lessor's voluntary or involuntary transfer or other disposition of the Aircraft or any Part thereof or interest therein, except a transfer or sale resulting directly from a Default or Event of Default hereunder.

10.2     Miscellaneous. In case any report or return is required to be made with respect to any Taxes which are an obligation of Lessee under this Section 10, Lessee will either make such report or return in such manner as will show the ownership of the Aircraft in Lessor and send a copy of such report or return to Lessor or will notify Lessor of such requirement and make such report or return in such manner as shall be reasonably satisfactory to Lessor. If actual notice is given by any taxing authority to Lessor that a report or return is required to be filed with respect to any such Taxes referred to in this Section 10, Lessor shall promptly notify Lessee of such required report or return. Lessor agrees to respond to any reasonable request of Lessee for information within the control of Lessor with respect to the filing of or need to file any report or return, but Lessee agrees to pay any reasonable costs, fees or other charges of independent counsel or independent accountants incurred in connection with such request.

Lessee's obligations under this Section 10 shall not be affected by any circumstances, including, without limitation, any set-off, counterclaim, recoupment, defense or other right which Lessee may have against Lessor or any other Person for any reason whatsoever. Lessee will pay to an Indemnitee to the extent permitted by Applicable Law, interest at the Interest Rate on any amount not paid to such Indemnitee when due pursuant to this Section 10 until the same shall be paid in full. All indemnities, obligations, adjustments and payments provided for in this Section 10 shall survive, and remain in full force and effect, notwithstanding the expiration or other termination of this Lease. The obligations of Lessee in respect of all such indemnities, obligations, adjustments and payments are expressly made for the benefit of, and shall be enforceable by, an Indemnitee, without declaring this Lease to be in default or taking other action thereunder, and notwithstanding any provision to the contrary contained herein.

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

10.3   Gross-Up. Lessee further agrees that if at any time any Applicable Law or any Governmental Entity requires any deduction or withholding in respect of Taxes from any payment of Rent or other amounts due under this Lease or under any other Operative Agreement, the sum due from Lessee in respect of such payment shall be increased to the extent necessary to ensure that, after paying such Taxes or making such deductions or withholding, Lessor or other Person entitled to the same, receives on the due date for such payment a net sum equal to the sum which it would have received had no such deduction or withholding been required to be made.

10.4   Timing of payment. Any amount payable by Lessee pursuant to this Section 10 will be paid promptly, or on demand by Lessor, within the later of ten (10) days of the demand or thirty (30) days prior to the date such Tax is due to the taxing authority.

10.5   Contest. Notwithstanding anything in this Section 10 to the contrary, so long as (i) a contest of such Taxes does not involve a material danger of the sale, forfeiture or loss of, or imposition of a Lien on, the Aircraft or any interest therein, and (ii) Lessee has provided Lessor with an opinion of independent tax counsel that a reasonable basis exists for contesting such claim, then Lessor or Indemnitee at Lessee's written request will in good faith, with due diligence and at Lessee's expense, contest (or permit Lessee to contest on behalf of Lessee, Lessor or Indemnitee) the validity, applicability or amount of such Taxes.

10.6   Refunds. Upon receipt by Lessor or Indemnitee of a refund of all or any part of any Taxes which Lessee has paid, Lessor or Indemnitee, as the case may be, will pay to Lessee the amount of such Taxes refunded, including any interest paid to Lessor or Indemnitee therewith.

## SECTION 11 CASUALTY OCCURRENCES

11.1   Casualty Occurrence with respect to the Aircraft. Immediately after a Casualty Occurrence with respect to the Aircraft, Lessee shall give Lessor written notice of such occurrence. On or before ninety (90) days after the date of the Casualty Occurrence, or upon receipt of insurance proceeds in an amount equal to the Casualty Value, whichever is sooner, Lessee shall pay to Lessor in immediately available funds the Casualty Value. Upon such payment, and the payment of all other amounts then due and payable under this Lease and the performance of all obligations of Lessee hereunder: (i) this Lease shall terminate with respect to the Aircraft, and (ii) Lessor will transfer to Lessee, without recourse or warranty, all of Lessor's right, title and interest, in and to the Aircraft, free and clear of Lessor's Liens, as well as all of Lessor's right, title and interest in and to the Engines constituting part of the Aircraft but not installed thereon at the time of the Casualty Occurrence. No Casualty Occurrence shall result in any abatement of Rent until receipt by Lessor of the Casualty Value.

11.2   Application of Proceeds and Payments. Any payments received at any time by Lessor or by Lessee from any insurer under insurance (other than liability insurance), or from any Governmental Entity or other Person with respect to a Casualty Occurrence will be applied to the payment of the Casualty Value due to Lessor pursuant to Section 11.1 of this Lease if not already paid by Lessee, or, if already paid by Lessee (unless a Default or an Event of Default shall have occurred and be continuing) shall be applied by Lessor to reimburse Lessee for its

22

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

payment of such Casualty Value and the balance of such payment, if any, remaining thereafter, if such payment is received with respect to insurance other than liability insurance (unless a Default or an Event of Default shall have occurred and be continuing) shall be paid over to, or retained by Lessee.

11.3    Requisition for Use by Government with Respect to the Aircraft.  In the event of the requisition for use by a Governmental Entity of the Airframe or either or both Engines (other than a requisition constituting a Casualty Occurrence), all of Lessee's obligations under this Lease, including without limitation those with respect to the Airframe or such Engine(s), shall continue to the same extent as if such requisition had not occurred; provided, however, that if it is impossible for Lessee to perform its maintenance obligations with respect to the Airframe or such Engine(s) because of the possession of the Airframe or such Engine by such Governmental Entity, promptly upon the return of the Airframe or such Engine(s)  to Lessee, Lessee shall undertake all actions necessary to restore the Aircraft or such Engine(s)  to the condition it would have been in had Lessee fully performed such obligations throughout the period of time the Aircraft or such Engine(s)  was in the possession of such Governmental Entity. All payments received by Lessor or Lessee from the Governmental Entity for the use of the Airframe or such Engine(s)  during the Term therefor shall be paid over to, or retained by, Lessee if no Default or Event of Default shall have occurred and be continuing; and all payments received by Lessor or Lessee from the Governmental Entity for the use of such item after the Term therefor shall be paid over to, or retained by, Lessor.

11.4    Other Applications.  Any amounts not payable to or retained by Lessee pursuant to this Section 11 or Section 12 hereof because a Default or an Event of Default shall have occurred and be continuing shall be paid to Lessor until such Default or Event of Default shall cease to be continuing.

## SECTION 12    INSURANCE and INDEMNIFICATION

12.1    Public Liability and Property Damage Insurance.  Lessee will carry and maintain in effect, at its own cost and expense, with Approved Insurers, comprehensive aircraft liability insurance (including, without limitation, contractual liability to cover Lessee's obligations under Section 13 of this Lease, and  legal liability) aircraft third party, passenger, baggage, cargo and mail liability and airline general third party liability (including premises, hangarkeepers and products liability), and property damage insurance ("Liability Insurance").   Such Liability Insurance shall at all times be in amounts not less than Two Hundred Fifty Million United States Dollars (US$250,000,000.00 ) per occurrence.

12.2    Insurance Against Loss or Damage.  Lessee, at its own cost and expense, will maintain in effect with Approved Insurers "all-risk" ground and flight aircraft hull insurance, including but not limited to fire, theft,  crash and collision covering such Aircraft, and fire and transit and  "all-risk" coverage insurance with respect to the Engines and Parts while not installed on such Aircraft or an aircraft, which in each case is at least as broad as coverage of the type carried by Lessee on the other aircraft in Lessee's fleet (and in form of AVN67B or comparable). Such insurance shall be for an amount not less than the Casualty Value.  Subject to Section 12.9 hereof, Lessee will further, at its own cost and expense, procure Hull War and Allied Perils

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

coverage, covering the Aircraft, to the fullest extent available, against those perils excluded by War, Hijacking and Other Perils Exclusion Clause AVN48B or any modification or substitution thereof, excluding (i) confiscation and requisition by the State of Registration, for the Casualty Value and (ii) paragraph (b) of AVN48B.

12.3    Required Policy Designations and Provisions.  The policies of insurance obtained and maintained pursuant to this Section, and each policy obtained in substitution or replacement for any such policies, shall:  (i) name  Lessor as owner of the Aircraft covered thereby and name the Indemnitees as additional insureds, and, with respect to hull insurance and comprehensive aircraft liability insurance on a primary noncontributory basis, Lessor as sole loss payee for the account of all interests, but without imposing upon the Indemnitees any obligation imposed upon the Lessee or, as applicable, the named insured, including, without limitation, the liability to pay any premiums for any such policies; (ii) expressly provide that, in respect of the interests of the Indemnitees in such policies, the insurance shall not be invalidated by any action or inaction of Lessee, and shall insure the Indemnitees regardless of any breach or violation of any warranty, declaration or condition contained in such policies by Lessee; (iii) provide that if such insurance is canceled by the Approved Insurers for any reason whatsoever, or is adversely changed in any way with respect to the interests of the Indemnitees or if such insurance is allowed to lapse for nonpayment of premium, such cancellation, adverse change or lapse shall not be effective as to the Indemnitees for thirty (30) days (seven (7) days in the case of any war risks or allied perils coverage or such lesser period of time as may be customarily applicable, and ten (10) days for non-payment of premium after receipt by Lessor of written notice of such prospective cancellation, change or lapse) after issuance to the Indemnitees of written notice by such insurer or insurers to Lessor of such prospective cancellation, change or lapse; (iv) include coverage for the territorial limits of any country in which the Aircraft may at any time be located; (v) provide that, as against the Indemnitees, the insurer waives any rights of set-off, counterclaim or any other deduction, whether by attachment or otherwise, and waives the rights it may have to be subrogated to any right of any insured against the Indemnitees with respect to the Aircraft; and (vi) provide that in the event of any damage or loss, whether or not a Casualty Occurrence hereunder, and which results in a payment, such payment shall be payable directly to Lessor, if applicable, as the sole loss payee, for the account of all interests.  Each such policy shall be primary without right of contribution from any other insurance which may be carried by the Indemnitees.

Lessee shall have the right to carry insurance in excess of the amounts required hereunder and the proceeds of such excess insurance (over and above the Casualty Value) shall be payable to Lessee.  Similarly, the Indemnitees shall have the right to carry additional and separate insurance for their own benefit at their own expense, without, however, thereby limiting Lessee's obligations under this Section 12.

12.4    Application of Insurance Proceeds for a Casualty Occurrence.  It is agreed that insurance payments which arise from insurance obtained hereunder and received as the result of the occurrence of a Casualty Occurrence shall be applied in accordance with Section 11.2 hereof.

12.5    Application of Insurance Proceeds for Other than a Casualty Occurrence.  The insurance payments for any property damage loss to the Airframe or either or both Engines not

24

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

constituting a Casualty Occurrence, or to any Part, shall be paid to Lessor, and thereafter be applied by Lessor in payment for repairs Lessee is required to perform or for replacement property Lessee is required to obtain in accordance with the terms of Sections 9 or 11 of this Lease, or, if such repair or replacement has already been paid for by Lessee, to reimburse Lessee for such repairs or replacements, and any balance remaining after compliance with such sections with respect to such loss shall be applied, in the sole discretion of Lessor, towards any amounts due and owing to Lessor hereunder by Lessee.

12.6    Application in Default.  Any amount referred to in Section 11.2 or Section 12.5 hereof which is otherwise payable to Lessee shall not be paid to Lessee, or, if it has been previously paid to Lessee, and not yet applied by Lessee as permitted or required hereunder, shall be immediately delivered by Lessee to Lessor, if at the time of such payment, a Default or an Event of Default shall have occurred and be continuing. In either case, all such amounts shall be held by Lessor as security for the obligations of Lessee, or, at the option of Lessor, applied by Lessor toward payment of any of Lessee's obligations at the time due hereunder. At such time as there shall not be continuing any such Default or Event of Default, all such amounts at the time held by Lessor in excess of the amount, if any, which Lessor has elected for application as provided above, shall be paid to Lessee.

12.7    Certificates of Insurance.  On or before the Delivery Date, and thereafter on each renewal by Lessee of the insurance required hereby, Lessee will furnish to Lessor a certificate and a letter of undertaking executed and delivered by an Approved Insurance Broker who is authorized by an Approved Insurer, appointed by Lessee, describing in reasonable detail insurance carried on the Aircraft and certifying that the insurance then maintained on the Aircraft complies with the terms of this Lease. Lessee will cause such Approved Insurance Broker who is authorized by an Approved Insurer to agree to advise Lessor in writing or by telex: (i) at least ten (10) days (seven (7) days in the case of any war risk and allied perils coverage or such lesser period of time as may be customarily applicable) prior to the termination or cancellation by the underwriters for any reason (including, without limitation, failure to pay the premium therefor) ; and (ii) at least three (3) Business Days or, in the case of any war risk and allied perils coverage, such lesser period of time as may be customarily applicable, prior to any non-renewal by the underwriters for any reason (including, without limitation, failure to pay the premium therefor) .

12.8    Reinsurance.  In the event that the insurances required hereunder are reinsured, such reinsurance shall contain a "cut-through" clause reasonably satisfactory to Lessor, and Lessee will furnish to Lessor a certificate and a letter of undertaking executed and delivered by an Approved Insurance Broker who is authorized by an Approved Insurer appointed by Lessee, describing in reasonable detail the reinsurance carried on the Aircraft and certifying that the reinsurance then maintained on the Aircraft complies with the terms of this Lease.

12.9    Indemnification.  Lessee hereby agrees and undertakes to indemnify, reimburse and hold harmless each Indemnitee from and against any and all claims, damages, losses, liabilities, demands, suits, judgments, settlements, causes of action, legal proceedings (whether civil or criminal), penalties, fines, other actions, and any attorneys' fees and all other costs and expenses in connection therewith, of whatsoever kind or nature, including any of the foregoing arising or imposed with or without any such Indemnitee's fault or negligence or under the

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

doctrine of strict liability or any other theory of liability (any and all of which are hereafter referred to as "Claims") which in any way may result from, pertain to, or arise in any manner out of, or are in any manner related to: (i) any act or omission of Lessee, or its employees, agents, officers, directors, shareholders, or other representatives in respect of the transactions contemplated hereby, or the enforcement of any of the terms hereof, including but not limited to the breach of any representation, warranty, covenant, obligation or duty of Lessee hereunder or under any Operative Agreement or any other document or agreement executed and delivered in connection herewith or with respect to any Indemnitee; or (ii) the condition, manufacture, delivery, lease, acceptance, possession, repossession, return, disposition pursuant to the exercise of remedies under Section 17 hereof, airworthiness, use, maintenance, storage or operation of the Aircraft, the Airframe, either or both Engines or any Part either in the air or on the ground; or (iii) any defect in the Aircraft (whether or not discovered or discoverable by Lessee or Lessor) arising from any material or articles or Parts used therein or from the design, testing, or use thereof or from any maintenance, repair, modification, alteration, service, repair, overhaul, or testing of the Aircraft, whether or not the Aircraft is in the possession of Lessee, and regardless of where the Aircraft may then be located; or (iv) any transaction, approval, or document contemplated by this Lease or any Operative Agreement, or given or entered into in connection herewith or therewith; provided, however, that Lessee shall be subrogated to all rights and remedies which Lessor may have against the Manufacturer, the Engine Manufacturer, any Approved Maintenance Provider, or the manufacturer of any Part, or any of their subcontractors. In the event Lessee is required to indemnify any Indemnitee hereunder, Lessee shall pay to such Indemnitee an amount which, after deduction of all Taxes and like charges required to be paid by such Indemnitee in respect of such payment, is equal to the amount of the indemnification required, net of any credits received by such Indemnitee by reason of having made such payments, provided, however, that all of the provisions of Section 10.3 hereof shall apply to such payment.

12.10 Lessee hereby waives, and releases each Indemnitee from any Claims (whether now existing or hereafter arising) for or on account of or arising or in any way connected with injury to or death of any passengers, third parties, personnel or any agent of Lessee or loss or damage to property of Lessee or the loss of use of any property which may result from or arise in any manner out of or in relation to the ownership, manufacture, purchase, delivery, leasing, return, condition, use, maintenance, storage, disposition, repossession or operation of the Aircraft, either in the air or on the ground, or which may be caused by any defect in the Aircraft from the material or any article or Part used therein or from the design or testing thereof, or use thereof or from any maintenance, service, repair, overhaul, or testing of the Aircraft regardless of when such defect may be discovered, whether or not the Aircraft is at the time in the possession of Lessee, and regardless of the location of the Aircraft at any such time.

12.11 The indemnities contained in Section 12.9 shall survive the execution and delivery of this Lease and the other Operative Agreements, and shall continue in full force and effect notwithstanding the expiration or other termination of this Lease or other Operative Agreement and are expressly made for the benefit of and shall be enforceable by each Indemnitee.

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

12.12 The following are excluded from Lessee's agreement to indemnify any Indemnitee under Section 12.9:

(a)   any claim judicially determined to have been caused by the gross negligence or willful misconduct of such Indemnitee;

(b)   any Claim arising from acts or events which occur after the Return Occasion pursuant to and in accordance with the terms and conditions of this Lease (other than pursuant to Section 18 hereof, in which case Lessee's obligations and liability under this Section 13 shall survive for so long as Lessor shall be entitled to exercise remedies under Section 18 hereof) and the payment and performance in full by Lessee of each of its obligations and liabilities under the Operative Agreements;

(c)   any Claim arising from acts or events which occur prior to delivery of the Aircraft to Lessee;

(d)   any Claim that arises solely and directly from the breach by an Indemnitee of this Lease or any of the other Operative Documents to which such Indemnitee is a party;

(e)   any Claim to the extent Lessee's defense of such Claim is precluded as a result of the failure of an Indemnitee to timely notify Lessee of such Claim; and

(f)   any Claim that constitutes the ordinary and usual operating an overhead expense of an Indemnitee.

## SECTION 13 LIENS

Lessee shall not directly or indirectly create, incur, assume or suffer to exist any Lien on or with respect to the Aircraft, title thereto or any interest therein, except: (i) the respective rights of Lessor and Lessee as herein provided; (ii) Lessor's Liens with respect to the Aircraft; and (iii) Permitted Liens.

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

## SECTION 14 PERFECTION OF TITLE AND FURTHER ASSURANCES

14.1    Recordation of Lease.  Lessee shall, at Lessee's cost and expense, cause this Lease, the Operative Agreements, as appropriate, all exhibits hereto, any amendments or supplements hereto, and any and all additional instruments which shall be executed pursuant to the terms hereof to be kept, filed and recorded, and to be re-executed, re-filed and re-recorded at all times during the Term with the FAA and each other Governmental Entity having jurisdiction over the Aircraft, this Lease, the Operative Agreements and the transactions contemplated hereby and thereby to the extent required to perfect and preserve Lessor's interest and title in and to the Aircraft, this Lease and each Operative Agreement, to the maximum extent possible under Applicable Law.

14.2    Other Filings.

(a)    Upon the occurrence of an Event of Default if at any time any filing or recording is reasonably necessary to protect the interest of Lessor, Lessee, at its own cost and expense and upon request by Lessor, shall cause this Lease and any and all additional instruments which shall be executed pursuant to the terms hereof, to be kept, filed and recorded and to be re-executed, re-filed and re-recorded in the appropriate office pursuant to Applicable Law to perfect, protect and preserve the rights and interests of Lessor hereunder and in the Aircraft.  At the reasonable request of Lessor, Lessee shall furnish to Lessor opinions of counsel or other evidence satisfactory to Lessor of each such filing or re-filing and recordation or re-recordation.

(b)    In addition, Lessee will promptly and duly execute and deliver to Lessor such further documents and assurances and take such further actions as Lessor may from time to time reasonably request in order to more effectively carry out the intent and purpose of this Lease and to establish, protect and perfect the rights and remedies created or intended to be created in favor of Lessor hereunder.

(c)    Lessee and Lessor will cause an International Interest to be registered with the International Registry with respect to the Airframe and the Engines.

## SECTION 15 RETURN OF AIRCRAFT AND RECORDS

15.1    Return.  On the Expiration Date, subject to Section 15.11, or such other Return Occasion, Lessee, at its own expense, shall return the Aircraft to Lessor in the condition specified in Exhibit E hereto at a location within the continental U.S.A. specified by Lessor, or such other location as Lessee and Lessor may mutually agree (the "Return Location") fully equipped, with all required Parts and Engines, duly installed thereon, by delivering the same to Lessor at such location.  At such time as the Aircraft has been inspected by Lessor and found to be in the condition required hereunder, Lessor shall issue a redelivery receipt ("Redelivery Receipt") to Lessee confirming the same.

15.2    Legal Status Upon Return.  Upon any Return Occasion, to the extent in such condition at the time of delivery to Lessee hereunder, the Aircraft:  (i) shall be free and clear of all Liens, except for Lessor's Liens; (ii) shall have a current, valid certificate of airworthiness from the FAA; and (iii) shall be in full compliance with the Maintenance Program and all

28

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

Airworthiness Directives and Service Bulletins (as contemplated by Section 9.3 hereof), and other FAA regulations requiring compliance on or before the Return Occasion completed.

15.3    Records. Upon the Return Occasion, Lessee shall deliver to Lessor all Aircraft Documents. Lessee shall deliver to Lessor all such Maintenance Program data and task cards as required to transition the Aircraft to another operator's maintenance program.

15.4    Service Bulletin and Modification Kits. At or upon the return of the Aircraft pursuant to this Section 15, Lessee shall deliver to Lessor, at no cost to Lessor, all service bulletin kits furnished without charge by a manufacturer for installation on the Aircraft which have not been so installed, together with appropriate instructions for installation. In the event such uninstalled kits were purchased or manufactured by Lessee and Lessee seeks to sell such kit, then Lessor shall have a right of first refusal to purchase such kits from Lessee after return of the Aircraft to Lessor hereunder.

15.5    Condition of Aircraft. Upon the Return Occasion, Lessee shall return the Aircraft to Lessor in such condition that the Aircraft shall comply with all of the conditions set forth in Exhibit E hereto, with all Aircraft systems fully functional and in good working order.

15.6    Final Inspection. Upon the Return Occasion, Lessee shall make the Aircraft available, at Lessee's expense, to Lessor at Lessee's principal maintenance base or such other location mutually agreed to by Lessor and Lessee for detailed inspection in order to verify that the condition of the Aircraft complies with the requirements set forth above, and Lessee shall thereafter make the Aircraft available at the Return Location for a further and final inspection of the Engines, (such inspections being hereinafter collectively referred to as the "Final Inspection"). Lessor shall give Lessee not less than ten (10) days prior written notice of the commencement date of such Final Inspection. The Final Inspection shall commence on or before the Expiration Date with respect to the Aircraft and shall continue on consecutive days until all activity required above to be conducted during the Final Inspection has been concluded. To the extent that any portion of the Final Inspection extends beyond the Expiration Date, and to the extent that any such delay was not caused by the Lessee, Lessee shall not be responsible to pay any Rent beyond the Expiration Date. Any storage expense attributable to the Final Inspection extending beyond the Expiration Date shall be the sole responsibility of the Lessor.

15.7    Aircraft Documentation. In order to enable Lessor to prepare for the Final Inspection of the Aircraft pursuant to Section 15.5 above, Lessee agrees to make available to Lessor at Lessee's principal maintenance base not later than ten (10) days prior to the commencement of such Final Inspection, the Aircraft Documents, together with such other documentation regarding the condition, use, maintenance, operation and history of the Aircraft generated during Lessee's possession of the Aircraft, and as Lessor may otherwise reasonably request.

15.8    [Intentionally Omitted]

15.9    Return of Security Deposit. Upon compliance by Lessee with all of the terms and conditions of this Lease on or as of the Expiration Date, and provided no Event of Default has occurred and is continuing, Lessor shall upon the execution and delivery of the Redelivery

29

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

Receipt return the Security Deposit (or that portion of the Security Deposit remaining after application thereof by Lessor in accordance with the terms thereof) to Lessee within ten (10) business days.

## SECTION 16 EVENTS OF DEFAULT

Any one or more of the following occurrences or events shall constitute an Event of Default:

(a)      Lessee shall fail to make any payment of Rent to Lessor within three (3) business days following the date when it is due under this Lease;

(b)      Lessee (i) shall fail to obtain and maintain any insurance required under the provisions of Section 12 hereof, (ii) shall let any such insurance coverage lapse, or shall operate the Aircraft outside of the scope of the insurance coverage maintained with respect to the Aircraft or (iii) shall fail to redeliver the Aircraft to Lessor on the Expiration Date in the Redelivery Condition and in accordance with the return conditions set forth herein;

(c)      any representation or warranty made by Lessee in Sections 5.3(a) through 5.3(k) hereof inclusive is incorrect at the time given in any material respect; any other representation or warranty made by Lessee herein or in any document or certificate furnished to Lessor in connection herewith or therewith or pursuant hereto is incorrect in any material respect at any time during the Term and Lessee fails to cure the same so as to make the representation or warranty correct within thirty (30) days after Lessee has actual notice thereof and after notice from Lessor, or such longer period as Lessor shall agree provided that Lessee is using best efforts in good faith to correct such defect;

(d)      Lessee shall fail to perform or observe any other covenant, condition or agreement to be performed or observed by it pursuant to this Lease or any other Operative Agreement, and such failure shall continue for a period of thirty (30) days after notice thereof is given by Lessor to Lessee, or if Lessee shall fail to observe its covenant to keep the Aircraft free and clear of Liens (subject to Section 14 hereof), thirty (30) days after the date of imposition of any such Lien;

(e)      Lessee consents to the appointment of a receiver, trustee or liquidator of itself or of a substantial part of its property, or Lessee admits in writing its inability to pay its debts generally as they come due, or makes a general assignment for the benefit of creditors, or Lessee files a voluntary petition in bankruptcy or a voluntary petition seeking reorganization in a proceeding under any bankruptcy laws, as now or hereafter in effect (other than for purposes of a solvent reorganization on terms previously approved by Lessor), or an answer admitting the material allegations of a petition filed against Lessee in any such proceeding, or Lessee by voluntary petition, answers or consents or seeks relief under the provisions of any bankruptcy, insolvency or other similar law providing for the reorganization or winding-up of

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

corporations involving an agreement, composition, extension or adjustment with its creditors;

(f)     an order, judgment or decree is entered by any court, with or without the consent of Lessee, appointing a receiver, trustee or liquidator for Lessee or of all or any substantial part of its property, respectively, or all or any substantial part of the property of Lessee is sequestered, and any such order, judgment or decree of appointment or sequestration remains in effect, undismissed, unstayed or unvacated for a period of sixty (60) days after the date of entry thereof;

(g)     a petition against Lessee, respectively, in a proceeding under bankruptcy, insolvency or other similar laws of any Governmental Entity (as now or hereafter in effect) is filed and is not withdrawn or dismissed within sixty (60) days thereafter, or if, under the provisions of any Applicable Law providing for reorganization or winding-up of corporations which may apply to Lessee, any court of competent jurisdiction assumes jurisdiction over, or custody or control of, Lessee or of all or any substantial part of its property, respectively, and such jurisdiction, custody or control remains in effect, unrelinquished, unstayed or unterminated for a period of sixty (60) days;

(h)     a final judgment for the payment of money not covered by insurance in excess of Five Hundred Thousand United States Dollars (US$500,000.00), or final judgments for the payment of money not covered by insurance in excess of Five Hundred Thousand United States Dollars (US$500,000.00) in the aggregate, shall be rendered against Lessee, and the same shall remain undischarged for a period of thirty (30) days during which execution thereof shall not be effectively stayed by agreement of the parties involved, stayed by appeal or court order; or

(i)     Lessee shall default in any covenant or agreement relating to any obligation of Lessee for borrowed money in excess of $500,000.00 or for the deferred purchase price or the rental of property with a remaining balance (in the case of rentals discounted to present value using a discount rate of 5%) in excess of $500,000.00, and such failure or default shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such obligation and the maturity of such obligation has been accelerated by the holders of such obligation or any lessor shall have terminated its lease or required the payment of any termination, stipulated loss, liquidated damages or similar amount, or

(j)     An event of default shall occur under any lease (other than this Lease) under which Lessee or any of its affiliates leases an aircraft (other than the Aircraft) from Lessor, or any affiliate of the Lessor or an event of default shall occur under any financing agreement under which Lessor, or any of affiliate of the Lessor provides financing to Lessee or any of its affiliates for an aircraft (other than the Aircraft).

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

## SECTION 17 REMEDIES

17.1     Upon the occurrence of any Event of Default, Lessor may, at its option and without the necessity of written notice to Lessee, declare this Lease to be in default and, at any time thereafter, Lessor may exercise one or more of the following remedies as Lessor in its sole discretion shall elect, to the extent available and permitted by, and subject to compliance with any mandatory requirements of any Applicable Law then in effect:

(a)          demand that Lessee, and Lessee shall upon such demand of Lessor and at Lessee's expense, immediately return the Aircraft to Lessor at such location as may be directed by Lessor, in the manner specified in such notice, and such return shall not be delayed for purposes of complying with the return conditions specified in Section 15 hereof (none of which conditions shall be deemed to affect Lessor's possession of the Aircraft) or delayed for any other reason.  Notwithstanding the foregoing, at Lessor's option, Lessee shall be required thereafter to take such actions, at Lessee's expense, as would be required by the provisions of this Lease if the Aircraft were being returned at the end of the Term hereof.  In addition, Lessor, at its option and to the extent permitted by Applicable Law, may enter upon the premises where all or any part of the Aircraft is located and take immediate possession of and, at Lessor's sole option, remove the same (and/or any engine which is not an Engine but which is installed on the Airframe, subject to the rights of the owner, lessor or secured party thereof) by summary proceedings or otherwise, all without liability accruing to Lessor for or by reason of such entry or taking of possession whether for the restoration of damage to property, or otherwise, caused by such entry or taking, except damage caused by gross negligence or willful misconduct of Lessor;

(b)          sell at private or public sale, as Lessor may determine, or hold, use, operate or lease to others the Aircraft as Lessor in its sole discretion may determine, all free and clear of any rights of Lessee;

(c)          proceed by appropriate court action or actions, either at law or in equity, to enforce performance by Lessee of the applicable covenants of this Lease and to recover damages for the breach thereof as hereinafter set forth and as otherwise available under Law and/or rescind this Lease;

(d)          retain and / or liquidate the Security Deposit;

(e)          terminate this Lease by written notice to Lessee and/or repossess the Aircraft;

(f)          send a written notice to Lessee specifying a payment date not earlier than ten (10) days from the date of such notice, that Lessee must pay to Lessor on demand on the payment date specified in such notice, as liquidated damages for loss of a bargain and not as a penalty, the sum of any Rent due on or before such payment date (together with interest, if any, on such amount at the Interest Rate from such specified payment date until the date of actual payment of such amount);   and/or

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

(g)      exercise any other remedies available under Applicable Law, or under or pursuant to any other Operative Agreement.

17.2    Upon the occurrence of an Event of Default, in effecting any repossession, Lessor, its representatives and agents, to the extent permitted by Applicable Law shall: (i) have the right to enter upon any premises where it reasonably believes the Aircraft, the Airframe, an Engine or Part to be located; (ii) not be liable, in conversion or otherwise, for the taking of any personal property of Lessee which is in or attached to the Aircraft, the Airframe, an Engine or Part which is repossessed; provided, however, that Lessor shall return to Lessee all personal property of Lessee which was on the Aircraft at the time Lessor re-takes possession of the Aircraft; (iii) not be liable or responsible, in any manner, for any inadvertent damage or injury to any of Lessee's property in repossessing and holding the Aircraft, the Airframe, an Engine or Part, except for that caused by or in connection with Lessor's gross negligence or willful misconduct; (iv) have the right to maintain possession of and dispose of the Aircraft, the Airframe, the Engines or Part on any premises owned by Lessee or under Lessee's control; and (v) have the right to obtain a key to any premises at which the Aircraft, the Airframe, either or both Engines or Part may be located from the landlord or owner thereof.

17.3    Upon the occurrence of an Event of Default, if demanded by Lessor, Lessee, at its sole expense, shall assemble and make the Aircraft, the Airframe, the Engines or Parts available at such location as may be directed by Lessor. Lessee hereby agrees that, in the event of the return to or repossession by Lessor of the Aircraft, the Airframe, the Engines or Parts, any rights in any warranty (express or implied) heretofore assigned to Lessee or otherwise held by Lessee shall without further act, notice or writing be assigned or reassigned to Lessor, if assignable. Lessee shall be liable to Lessor for all out-of-pocket expenses, disbursements, costs and fees incurred: (i) in repossessing, storing, preserving, shipping, maintaining, repairing and refurbishing the Aircraft, the Airframe, an Engine or Part to the condition required by Section 15 hereof; (ii) in preparing the Aircraft, the Airframe, an Engine or Part for sale or lease, advertising the sale or lease of the Aircraft, the Airframe, an Engine or Part and selling or releasing the Aircraft, the Airframe, an Engine or Part, and (iii) after an Event of Default, in connection with the Aircraft, any Part, or any Operative Agreement. Lessor is hereby authorized and instructed, at its option, to make reasonable expenditures which Lessor, in its sole discretion, considers advisable to repair and restore the Aircraft, the Airframe, an Engine or Part to the condition required by Section 15 hereof, all at Lessee's sole expense.

17.4    Upon the occurrence of any Event of Default and the delivery by Lessor to Lessee of the notice specified in 17.1(f) hereof, the Lessee shall pay to Lessor the amounts specified in Section 17.1(f).

17.5    Whether or not Lessor shall have exercised, or shall thereafter at any time exercise, any of its rights hereunder with respect to the Aircraft or Lessee upon the occurrence of an Event of Default, Lessee and Lessor hereby stipulate that Lessor shall be entitled to sequester the Aircraft and Lessee hereby agrees to deliver the Aircraft into the custody of Lessor or its designated agents for such purpose, at Lessee's expense, upon receipt of a written demand from Lessor with respect thereto.

33

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

17.6   No remedy referred to in this Section 17 is intended to be exclusive, but, to the extent permissible hereunder or under Applicable Law, each shall be cumulative and in addition to any other remedy referred to above or otherwise available to Lessor at law or in equity; and the exercise or beginning of exercise by Lessor of any one or more of such remedies shall not preclude the simultaneous or later exercise by Lessor of any or all of such other remedies. No express or implied waiver by Lessor of any Default or Event of Default shall in any way be, or be construed to be, a waiver of any future or subsequent Default or Event of Default.

## SECTION 18 ALIENATION; SECTION 1110 AND CAPETOWN;

18.1   Alienation. Lessor shall have the right, at its sole cost and expense, to assign, sell or encumber any interest of Lessor in the Aircraft or this Lease and/or the proceeds hereof subject to the rights of Lessee under the provisions of this Lease. To effect or facilitate any such assignment, sale or encumbrance, Lessee agrees to provide, at Lessor's sole cost and expense, including, but not limited to, Lessee's reasonable attorney's fees and costs, such agreements, consents, conveyances or documents as may be reasonably requested by Lessor, which shall include, without limitation, an unrestricted release of Lessor from its obligations under this Lease. The agreements, covenants, obligations and liabilities contained herein, including but not limited to all obligations to pay Rent and to insure and to indemnify each Indemnitee, are made for the benefit of each Indemnitee and their respective successors and assigns; provided, however, that no assignment, sale or encumbrance shall, at the time of such assignment increase the aggregate financial exposure under the indemnity obligations of Lessee under this Lease as compared to what such obligations would have been had such assignment, sale or encumbrance not occurred.

18.2   Section 1110 and the Cape Town Convention.

(a)   Subject to the applicability of Section 1110 (defined below), throughout the Term Lessee shall take any reasonable actions requested by Lessor to enable Lessor to receive the benefits of Section 1110 of the Bankruptcy Code, 11 U.S.C. §1110, as amended ("Section 1110") or any equivalent provisions under the Cape Town Convention.

(b)   The Lessor and the Lessee intend that this Lease constitutes a "true lease" and a lease for all United States federal income tax purposes. The Lessor and the Lessee further intend and agree that, to the extent applicable, the Lessor shall be entitled to the full benefits afforded lessors of aircraft under Section 1110 or under the equivalent provisions under the Cape Town Convention.

(c)   Lessee covenants to and agrees with Lessor that Lessee will support any motion, petition or application filed by Lessor in pursuance of the exercise of its rights and remedies under this Lease with any bankruptcy court having jurisdiction over Lessee, whereby Lessor seeks recovery of possession of the Aircraft under said Section 1110 (as applicable) or under the Cape Town Convention, and Lessee shall not in any way oppose such action by Lessor.

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

## SECTION 19 MISCELLANEOUS AND TRUTH IN LEASING

19.1    Severability, Amendment and Construction.  Any provision of this Lease, which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof; and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by Applicable Law, Lessee hereby waives any provisions of Applicable Law which renders any provisions hereof prohibited or unenforceable in any respect. This Lease supersedes any prior or contemporaneous agreements, whether oral or in writing, of the parties hereto and shall constitute the entire agreement of the parties hereto. No term or provision of this Lease may be changed, waived, discharged or terminated orally, but only by an instrument in writing expressed to be a supplement to this Lease signed under hand by an officer of the party against which the enforcement of the change, waiver, discharge or termination is sought. This Lease shall constitute an agreement of lease, and nothing herein shall be construed as conveying to Lessee any right, title or interest in the Aircraft or the Engines or any Part except as a lessee only, and subject in all events to the terms and conditions hereof.  The headings in this Lease are for convenience of reference only and shall not define or limit any terms of the provisions hereof. Whenever required by the context hereof, the singular shall include the plural and vice versa. All Exhibits attached hereto are incorporated herein by reference and are deemed to be a part hereof.

19.2    Governing Law; Jurisdiction.

(a)    This Lease shall in all respects be governed by and construed in accordance with the internal laws of the State of Florida without giving effect to the conflict of laws provisions of the State of Florida, including all matters of construction, validity and performance. Lessor and Lessee hereby expressly submit to the exclusive jurisdiction of Dade County, Florida. Lessee further agrees that any legal action or proceeding against it or any of its assets may be brought in Florida or in any jurisdiction where Lessee or any of its assets may be found.

(b)    The foregoing, however, shall not limit the rights of Lessor or Lessee to serve process in any other manner permitted by Applicable Law or to bring any legal action or proceeding or to obtain execution of judgment or to recover the Aircraft in any jurisdiction. Lessee further agrees that final judgment against Lessee in any action or proceeding in connection with this Lease shall be conclusive and may be enforced in any other jurisdiction within or outside of Florida by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and the amount of Lessee's indebtedness. Lessee hereby irrevocably waives, to the fullest extent permitted by Applicable Law, any objection which Lessee may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Lease brought in Florida or the courts of any country or place where Lessee or any of its assets may be found, and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in Florida has been brought in an inconvenient forum.

(c)    The foregoing submission to jurisdiction shall not be construed so as to limit the right of either party to take proceedings to enforce any judgment awarded against the other in whatsoever jurisdictions shall to it seem fit nor shall the taking of proceedings in any one or more jurisdiction, preclude the taking of proceedings in any other jurisdiction, whether

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

concurrently or not. To the extent that each of Lessor and Lessee may be entitled, in any jurisdiction on which judicial proceedings may at any time be commenced with respect to this Lease or any instrument, agreement or documents contemplated hereby or referred to herein, to claim for itself or its revenues or assets immunity (whether by reason of sovereignty or otherwise) from suit, from the in rem or in personam jurisdiction of any court, from attachment prior to judgment, from attachment in aid of execution of judgment or from any other legal process, and to the extent that in any such jurisdiction there may be attributed such an immunity (whether or not claimed), each of Lessor and Lessee hereby irrevocable waives such immunity in respect of suit, jurisdiction of any court attachment prior to judgment, attachment in aid of execution of judgment, set-off, execution of judgment and other legal process and consents generally in respect of any such legal action or proceedings to the giving of any relief or the issue of any process in connection with such action or proceedings including, without limitation, the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) or any order or judgment which may be made or given in such action or proceedings.

19.3    Notices.  All notices required under the terms and provisions hereof shall be in writing, shall be sent to Lessor or Lessee at their respective addresses or e-mail addresses set forth in Exhibit C hereto (or such other addresses or e-mail address as the parties may designate from time to time by notice pursuant to this Section 19.3 by e-mail or by courier service. Any such notice shall become effective upon the earlier of actual receipt or the third (3rd) day following the date such notice is sent by air courier.

19.4    Lessor's Right to Perform for Lessee.  If Lessee fails to make any payment of Supplemental Rent required to be made by it hereunder or fails to perform or comply with any covenant, agreement or obligation contained herein, Lessor shall have the right but not the obligation to make such payment or conform or comply with such agreement, covenant or obligation, and the amount of such payment and the amount of the reasonable expenses of Lessor incurred in connection with such payment or the performance thereof or compliance therewith, together with interest thereon at the Interest Rate, shall be payable by Lessee to Lessor (as Supplemental Rent) upon demand. Lessor agrees to notify Lessee in writing prior to making any payment under this Section 19.4), unless the Aircraft will be in danger of loss, sale, confiscation, forfeiture or seizure should such payment not be made. The taking of any such action by Lessor pursuant to this Section 19.4 shall not constitute a waiver or release of any obligation of Lessee under the Lease, nor a waiver of any Event of Default which may arise out of Lessee's nonperformance of such obligation, nor an election or waiver by Lessor of any remedy or right available to Lessor under or in relation to this Lease.

19.5    Counterparts.  This Lease and each Lease Supplement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

19.6    Quiet Enjoyment.  Lessor covenants that, so long as no Default or Event of Default has occurred or is continuing, Lessee shall quietly enjoy the use and possession of the Aircraft without interference by Lessor, or by any Person lawfully claiming by or through Lessor.

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

19.7    Brokers. Lessor and Lessee each agrees to indemnify and hold the other harmless from and against any and all claims, suits, damages, costs and expenses (including, but not limited to reasonable attorneys' fees) asserted by any agent, broker or other third party for any commission or compensation of any nature whatsoever based upon the lease of the Aircraft, if such claim, damage, cost or expense arises out of any action or alleged action by the indemnifying party, its employees or agents.

19.8    Expenses. Except as otherwise expressly provided herein, each Party Lessee shall be responsible for and pay its costs and expenses incurred by it in connection with the negotiation and drafting of this Lease and the consummation of the transactions contemplated hereby.

19.2    Confidential Treatment. The Parties each acknowledge that the commercial and financial information contained in this Lease is considered confidential. Each Party agrees that it will treat the contents and subject matter of this Lease as confidential and will not, without the prior written consent of the other, disclose this Lease or the subject matter hereof to any third party except to their respective affiliates and its and their respective employees, officers, directors, managers, members, partners, professional advisors, potential financing sources, insurance brokers, auditors and or other agents, as may be required by Applicable Law or rule or regulation of any Government Entity, or in connection with any court order, court ruling or subpoena or as may be required to enforce the terms of this Lease. Upon disclosure required by any Applicable Law, rule or regulation, such disclosing Party shall use its commercially reasonable efforts to secure confidential treatment from all recipients of such confidential information and shall cooperate with the efforts of the other Party to ensure such treatment; provided that this sentence shall not apply where such disclosure makes the previously confidential information publicly available. Each party shall inform its representatives that it expects them to comply with the provisions of this Section 19.9 and each party shall be responsible for any breach of the provisions of this Section 19.9 by any of its representatives.

19.10            **TRUTH IN LEASING STATEMENT**

(a).    AS OF THE DELIVERY DATE, LESSEE HAS REVIEWED THE AIRCRAFT'S MAINTENANCE AND OPERATING LOGS AND HAS FOUND THAT DURING SUCH PORTION OF THE 12 MONTH PERIOD PRECEDING THE DATE OF THE DELIVERY DATE AS THE AIRCRAFT HAS BEEN REGISTERED WITH THE FEDERAL AVIATION ADMINISTRATION AIRCRAFT REGISTRY, THE AIRCRAFT HAS BEEN MAINTAINED AND INSPECTED IN ACCORDANCE WITH THE PROVISIONS OF THE FEDERAL AVIATION REGULATIONS ("FAR"), PART 91 AND ALL APPLICABLE REQUIREMENTS FOR THE MAINTENANCE AND INSPECTION THEREUNDER HAVE BEEN MET.

(b).    LESSEE CERTIFIES THAT THE AIRCRAFT WILL BE MAINTAINED AND INSPECTED UNDER FAR PART 91 FOR OPERATIONS TO BE CONDUCTED UNDER THIS LEASE; AND LESSEE UNDERSTANDS THAT IT IS RESPONSIBLE FOR

DocuSign Envelope ID: CADEBA4B-4B23-4F36-98E8-9AFAC964B73F

OPERATIONAL CONTROL OF THE AIRCRAFT WHEN THE AIRCRAFT IS OPERATED PURSUANT TO THIS LEASE.

(c).   LESSEE   CERTIFIES   THAT   IT   UNDERSTANDS   ITS RESPONSIBILITIES FOR COMPLIANCE WITH APPLICABLE FARs; AND THE NAME AND   ADDRESS   AND   SIGNATURE   OF   THE   PERSON   RESPONSIBLE   FOR OPERATIONAL CONTROL OF THE AIRCRAFT UNDER THIS LEASE IS AS FOLLOWS:

> NAME: AIRCRAFT TRANSPORT SERVICES, INC
> ADDRESS: 4285 SW Martin Highway
> Palm City, FL 34990
>
> ┌─DocuSigned by:
> SIGNATURE: _____  🔒 Susan Lewis
> ATTN: Susan Lewis           └─324446A7A91045C...
> TITLE: President
> TELEPHONE:
> EMAIL: slewisfl@gmail.com

(d).   LESSOR AND LESSEE UNDERSTAND THAT AN EXPLANATION OF FACTORS BEARING ON OPERATIONAL CONTROL AND PERTINENT FEDERAL AVIATION REGULATIONS CAN BE OBTAINED FROM THE NEAREST FAA FLIGHT STANDARDS DISTRICT OFFICE.

## SECTION 20 RENEGOTIATION OF RENT AMOUNT AND LESSOR AND LESSEE RESPONSIBILITIES

20.1   Every twelve (12) month period, ending on the last day of the twelfth month of the Delivery Date, Lessor and/or Lessee have the option to renegotiate the Terms of this Agreement. Provided neither side opts to renegotiate the Terms of this Agreement, or mutual Terms are unable to be mutually agreed upon, then all Terms and Conditions set forth in this Agreement shall remain in full effect until the following end of the twelve (12) month period.

[SIGNATURE PAGE FOLLOWS]

38

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

IN WITNESS WHEREOF, Lessor and Lessee, each pursuant to due authority, have each caused this Lease Agreement to be executed by their duly authorized officers as of the day and year first above written.

LESSOR:

740SS, LLC

DocuSigned by:

RYAN G BOWEN

By: 6AC3399D541F487

Name: Ryan G Bowen

Title: Member

LESSEE:

AIRCRAFT TRANSPORT SERVICES, INC

By: _____

Name: Susan Lewis

Title: President

48

DocuSign Envelope ID: CADEBA4B-4B23-4F36-98E8-9AFAC964B73F

IN WITNESS WHEREOF, Lessor and Lessee, each pursuant to due authority, have each caused this Lease Agreement to be executed by their duly authorized officers as of the day and year first above written.

LESSOR:

740SS, LLC

By: _____

Name: Ryan G Bowen

Title: Member


LESSEE:

AIRCRAFT TRANSPORT SERVICES, INC

By: _____

Name: Susan Lewis

Title: President

48

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

## EXHIBIT A

## AIRCRAFT SPECIFICATION

| | |
|---|---|
| Aircraft Make and Model: | GULFSTREAM model Gulfstream GV |
| Manufacturer's Serial Number: | 532 |
| United State Registration Number: | N740SS |
| Year of Manufacture: | 1997 |
| Engine Make and Model | Rolls-Royce model BR710A1-10 |
| Manufacturer's Serial Numbers: | Serial Numbers: 11169 and 11170 |

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

**EXHIBIT B**

**AIRCRAFT DOCUMENT SUMMARY**

All Airframe, Engine, accessory and other logbooks, documents, manuals, data, and inspection, modification, and maintenance, and all engineering documents, and drawings related to modifications made to, and supplemental type certificate incorporated in and records relating to or required to be maintained with respect to the Aircraft and any additional documentation provided with the Aircraft when delivered new from the manufacturer, to the extent the foregoing is in Lessor's possession.

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

## EXHIBIT C

### [TO BE OMITTED FOR FAA FILING PURPOSES]
### AIRCRAFT LEASE AGREEMENT
### DEFINITIONS AND VALUES

Basic Rent:
The Basic Rent shall be $95,000 per Rent Period paid in advance on each Basic Rent Payment Date.

Basic Rent Payment Date:
The Basic Rent Payment Date shall be the first Business Day of each Rent Period.

Casualty Value:
Ten Million Seven Hundred Fifty Thousand Dollars ($10,750,000)

Delivery Location:
Goodyear, Arizona

Engine Manufacturer:
Rolls-Royce

Estimated Delivery Date:
January 1, 2023, or such other date mutually agreed by Lessor and Lessee.

Expiration Date:
Expiration Date shall mean the last day of Term; provided, however, the Expiration Date shall be the day on which title to the Aircraft is transferred to the Lessee.

Indemnitees
Lessor, the affiliates of Lessor, and each of their respective officers, directors, shareholders, members, managers, partners, controlling persons, agents, and employees, and their respective successors and assigns.

Interest Rate:
The greater of six percent (6%), or 2% over the rate announced by Citibank, N.A. in Florida as its "prime rate" from time to time, but not to exceed the maximum amount permitted by Law.

Lease Identification:
"Leased from 740SS, LLC as Owner and Lessor."

Lessee's Address:
Aircraft Transport Services, Inc.
4285 SW Martin Highway
Palm City, FL 34990
Email: _____

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

<u>Lessor's Address</u>:


Email:

<u>Manufacturer</u>:
Gulfstream Aerospace

<u>Payment Location</u>:
The account of Lessor as specified in writing by Lessor, from time to time.

<u>Security Deposit</u>:
Ninety Five Thousand Dollars ($95,000)

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

## EXHIBIT D
## LEASE SUPPLEMENT NO. 1

LEASE SUPPLEMENT NO. 1, dated December ___, 2022, between 740SS, LLC ("Lessor"), and AIRCRAFT TRANSPORT SERVICES, INC ("Lessee").

## WITNESSETH

WHEREAS, Lessor and Lessee have previously entered into that certain Aircraft Lease Agreement, dated as of December ___, 2022 (herein called the "Lease" and the defined terms therein being hereinafter used with the same meaning);.

WHEREAS, the Lease provides for the execution and delivery of a Lease Supplement substantially in the form hereof for the purpose of leasing the Aircraft described below under the Lease as and when delivered by Lessor to Lessee in accordance with the terms thereof; and

WHEREAS, Lessee now seeks to accept delivery of the Aircraft under and pursuant to the Lease, a counterpart of which is attached hereto and incorporated herein by reference, and this Lease Supplement and the Lease shall form one document.

NOW THEREFORE, for and in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Lessor and Lessee hereby agree as follows.

As of _____ (the "Delivery Time") on the date hereof, Lessor hereby delivers and leases to Lessee under the Lease, and Lessee hereby accepts and leases from Lessor under the Lease, that certain, Gulfstream Aerospace G-V aircraft, bearing registration mark N740SS and manufacturer's serial number 532 as follows:

| Total Hours | Total Cycles | Date of Last Annual Check | Hours/Cycles since last Annual Check | Pounds of Fuel on Board Aircraft |
|---|---|---|---|---|
| | | | | |

and the following Rolls-Royce model BR710A1-10 Engines:

| Serial Number | Hours Remaining to next Scheduled Removal | Cycles Remaining to next Scheduled Removal |
|---|---|---|
| 11169 | | |
| 11170 | | |

1.      The Delivery Date for the lease of the Aircraft is the date of this Lease Supplement set forth in the opening paragraph hereof.

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

2.      The Term shall commence on the Delivery Date and shall end on the 36th month anniversary of the date hereof.

3.      Lessee hereby confirms to Lessor that: (i) the Airframe and the Engine installed thereon or belonging thereto have been duly marked in accordance with the terms of Section 6 of the Lease, (ii) Lessee has inspected and hereby accepts the Aircraft, including the Aircraft Documents, for all purposes hereof and pursuant to Section 3.4 of the Lease.

4.      All of the terms and provisions of the Lease are incorporated herein by reference to the same extent as if fully set forth herein.

5.      This Lease Supplement may be executed in any number of counterparts, each of which counterparts, shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same Lease Supplement.

6.      All capitalized terms used herein and not otherwise defined herein shall have the meanings provided therefore in the Lease.

[SIGNATURE PAGE FOLLOWS]

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

IN WITNESS WHEREOF, Lessor and Lessee have caused this Lease Supplement No. 1 to be duly executed as of the day and year first above written.

LESSOR:

740SS, LLC

By: _____ DocuSigned by: Ryan G Bowen _____ 6AC3399D541F487

Name: Ryan G Bowen _____

Title: Member _____

LESSEE:

AIRCRAFT TRANSPORT SERVICES, INC

By: _____

Name: Susan Lewis _____

Title: President _____

DocuSign Envelope ID: CADEBA4B-4B23-4F36-98E8-9AFAC964B73F

IN WITNESS WHEREOF, Lessor and Lessee have caused this Lease Supplement No. 1 to be duly executed as of the day and year first above written.

LESSOR:

740SS, LLC

By: _____

Name: Ryan G Bowen

Title: Member

LESSEE:

AIRCRAFT TRANSPORT SERVICES, INC

By: ___ Susan Lewis
        —DocuSigned by:
        └─324446A7A91045C...

Name: Susan Lewis

Title: President

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

## EXHIBIT E

### RETURN CONDITION

1. The Aircraft shall be serviceable and airworthy, without any deferred maintenance, with all systems functioning in accordance with their intended use and clean in accordance with international airline standards.

2. Lessee's markings shall be removed.

3. The Aircraft shall have the Engine and avionics specified in Exhibit "A" and otherwise be in the same configuration and condition as delivered.

4. The Aircraft shall be in compliance with (i) all Airworthiness Directives issued by the FAA on or after the Delivery Date and (ii) and all Service Bulletins issued on or after the Delivery Date.

5. The Aircraft, Records and documents shall be acceptable to the FAA for FAR 91 operation, and the Records shall be delivered at the same time as the Aircraft. Such Records shall be in English, current with the latest entries and revisions, and shall provide "back to birth" traceability for any replacement LLP.

6. A full hot and cold-section video borescope of the Engines shall be performed at Lessee's expense, and witnessed by the Lessor up to engine program allowances. A full power assurance run on the Engine shall be performed at Lessee's expense and witnessed by Lessor. Any airworthiness discrepancies so discovered will be repaired by Lessee to applicable standards.

7. Each Engine will meet Manufacturer specifications and will not exceed any maintenance program soft-time or trend monitoring limits. Any discrepancies shall be rectified by Lessee at Lessee's expense unless otherwise mutually agreed by Lessor and Lessee.

8. All damage to the Aircraft shall have been repaired in accordance with the manufacturers' and FAA requirements, including appropriate documentation of such repairs for damage incurred during the term of the Lease.

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

**EXHIBIT F**

**MAINTENANCE RECORDING REQUIREMENTS**

A.   Lessee shall keep or maintain the following records

   1.   All the records required by the FAA and all records necessary (i) to maintain an FAA Certificate of Airworthiness for the Aircraft and (ii) to make the Aircraft immediately eligible for an FAA Certificate of Airworthiness after the end of the Term.

   2.   Records must contain the following information (to the extent such information is contained in records at Delivery to Lessee hereunder and to reflect Lessee's use and operation of the Aircraft hereunder):

      i.   The total time and total cycles in service of the Airframe, the Engines and all other time/cycle or calendar-controlled components.

      ii.   The current status of LLPs of each Engine.

      iii.   The time since last overhaul of all items installed on the Aircraft which are required to be overhauled on a specified time basis.

      iv.   The identification of the current inspection status of the Aircraft, including the times since the last inspections required by the inspection program under which the Aircraft and its appliances are maintained.

      v.   The current status of applicable Airworthiness Directives and service bulletins, including the method of compliance.

      vi.   A list of current major alterations to the Airframe, each Engine, rotor, and appliance.

      vii.   The Aircraft dent and buckle chart for all damage incurred on the Aircraft during the Term.

      viii.   The "back-to birth" documentation for all replacement LLPs

B.   The records specified in Paragraph A.2 of this section shall be retained and transferred with the Aircraft at the time the Aircraft is returned to Lessor.

C.   Lessee shall make all maintenance records required to be kept by this section available for inspection by the FAA or any authorized representative of the US National Transportation Safety Board (NTSB) in accordance with the US Federal Aviation Act.

DocuSign Envelope ID: CADEBA4B-4B23-4F36-98E8-9AFAC964B73F

## EXHIBIT G

### MONTHLY AIRCRAFT UTILIZATION REPORT
### [CALENDAR MONTH], [YEAR]

A. Cycles/Flight Hours for Airframe

|  | Flight Cycles During Period | Flight Hours During Period |
|---|---|---|
| Airframe Gulfstream GV 532 |  |  |

B. Cycles/Flight Hours for Engine

|  | Installed on Aircraft Serial # | Flight Cycles During Period | Flight Hours During Period |
|---|---|---|---|
| Engine Serial # |  |  |  |
| Engine Serial # |  |  |  |

C. Engine Removal (if any)

|  | Date of Removal and Reason | Flight Cycles During Period | Flight Hours During Period |
|---|---|---|---|
| Engine Serial # |  |  |  |
| Engine Serial # |  |  |  |

D. AD or SB Compliance During Period

| Number | Date | Compliance |
|---|---|---|

E. Describe Any Scheduled Maintenance, Repairs, Incidents or Accidents to Aircraft or the Engine During Period

The above information is true, correct and complete as of the date hereof, _____, ____.

LESSEE:

AIRCRAFT TRANSPORT SERVICES, INC

By: _____  DocuSigned by: Susan Lewis
Name: Susan Lewis    324446A7A91045C.
Title: President

DocuSign Envelope ID: E14113DD-D37B-424D-A900-17D3D6D9BCBC

# ADDENDUM LEASE AGREEMENT

Pursuant to **AIRCRAFT LEASE AGREEMENT** dated as of December ___, 2022 between 740SS, LLC as **Lessor, and Aircraft Transport Services, Inc as Lessee, parties agree to the following.**

**Owner Flight Hours**: Owner will be entitled to fly the Aircraft up to 50 hrs annually at $3,975 per hour so long as the Owner gives ATS at least 72 hours prior notice of its requirement for the Aircraft. Owner is additionally responsible for landing fees, overflights, handling fees, de-icing, catering, ground transportation, internet/wifi, and any other trip cost directly related to their itinerary, including pilot expenses, and pilot day fees. All flights shall be in accordance with ATS dispatch procedures and shall obtain a flight release from ATS dispatch to ensure crew and Aircraft maintenance requirements of FAR Part 135. ATS hereby represents and warrants to Owner that at any and all times during the term of this Agreement, ATS shall make available to the Owner the Aircraft (or a plane similar to the Aircraft). All flights shall have a minimum of 2.0 hours per day. All of such planes shall be available to Owner upon the request for such planes by Owner.

**Peak Travel Days**. For travel on Peak Travel Days, please see below "Peak Travel Days" for details on flight confirmations. Itineraries for travel within the Continental United States must be reserved by Owner and a confirmation document issued by ATS at least 7 days prior to the scheduled departure time. Itineraries that either originate or terminate in the Continental United States that also include travel within a 200-nautical mile radius of the Continental United States must be reserved by Owner and a confirmation document issued by ATS at least 7 days prior to the scheduled departure time. Bermuda, the Caribbean and Mexico. For travel to or from Bermuda, the Caribbean or Mexico, itineraries must be reserved by Owner and a confirmation document issued by ATS at least 10 days day prior to the scheduled departure time on Standard Travel Days, and 15 days prior to the scheduled departure time on Peak Travel Days.

Valid only for Domestic Flights, Alaska/Hawaii, Bermuda, the Caribbean and Mexico

**Peak Travel Days**
Super Bowl Weekend
Easter Week
Memorial Weekend
4th of July
Labor Day Weekend
Thanksgiving Week
Christmas/New Year's week

LESSOR:

740SS, LLC

By: _____

Name: Ryan G Bowen

Title: Member _____

LESSEE:

AIRCRAFT TRANSPORT SERVICES, INC

By: _____

Name: Susan Lewis _____

Title: President _____

DocuSign Envelope ID: CADEBA4B-4B23-4F36-98E8-9AFAC964B73F

## ADDENDUM LEASE AGREEMENT

Pursuant to **AIRCRAFT LEASE AGREEMENT** dated as of December \_\_\_, 2022 between 740SS, LLC as Lessor, and Aircraft Transport Services, Inc as Lessee, parties agree to the following.

**Owner Flight Hours**: Owner will be entitled to fly the Aircraft up to 50 hrs annually at $3,975 per hour so long as the Owner gives ATS at least 72 hours prior notice of its requirement for the Aircraft. Owner is additionally responsible for landing fees, overflights, handling fees, de-icing, catering, ground transportation, internet/wifi, and any other trip cost directly related to their itinerary, including pilot expenses, and pilot day fees. All flights shall be in accordance with ATS dispatch procedures and shall obtain a flight release from ATS dispatch to ensure crew and Aircraft maintenance requirements of FAR Part 135. ATS hereby represents and warrants to Owner that at any and all times during the term of this Agreement, ATS shall make available to the Owner the Aircraft (or a plane similar to the Aircraft). All flights shall have a minimum of 2.0 hours per day. All of such planes shall be available to Owner upon the request for such planes by Owner.

**Peak Travel Days.** For travel on Peak Travel Days, please see below "Peak Travel Days" for details on flight confirmations. Itineraries for travel within the Continental United States must be reserved by Owner and a confirmation document issued by ATS at least 7 days prior to the scheduled departure time. Itineraries that either originate or terminate in the Continental United States that also include travel within a 200-nautical mile radius of the Continental United States must be reserved by Owner and a confirmation document issued by ATS at least 7 days prior to the scheduled departure time. Bermuda, the Caribbean and Mexico. For travel to or from Bermuda, the Caribbean or Mexico, itineraries must be reserved by Owner and a confirmation document issued by ATS at least 10 days day prior to the scheduled departure time on Standard Travel Days, and 15 days prior to the scheduled departure time on Peak Travel Days.

Valid only for Domestic Flights, Alaska/Hawaii, Bermuda, the Caribbean and Mexico

**Peak Travel Days**
Super Bowl Weekend
Easter Week
Memorial Weekend
4th of July
Labor Day Weekend
Thanksgiving Week
Christmas/New Year's week

LESSOR:

740SS, LLC

By: _____

Name:   Ryan G Bowen

Title: Member

LESSEE:

AIRCRAFT TRANSPORT SERVICES, INC

By: _____   Susan Lewis

Name:   Susan Lewis    324446A7A91045C...

Title: President

# EXHIBIT "2"

**Douglas C. Waddoups**
Attorney at Law
dwaddoups@parrbrown.com

October 22, 2024

**VIA EMAIL and
US FEDEX**

Attn: John Scotto, CEO
Aircraft Transport Services, Inc.
4285 SW Martin Highway
Palm City, FL 34990
Email: js@atsflights.com

Dear Mr. Scotto,

Our firm represents Ryan Bowen who is the owner of 740SS, LLC ("740SS" or "Ryan") and we are writing in response to your letter dated October 9, 2024. This letter also serves as an official notice of default under the Aircraft Lease Agreement by and between 740SS and Aircraft Transport Services, Inc. ("ATS") dated December ___, 2022 (the "Lease"). If you are represented by counsel in this matter please forward this to them and provide us their contact information and we will engage with them directly.

In your letter, you suggest that ATS may be excused from its obligations under the Lease due to "legal frustration". Your argument has no merit. While it is true that in rare instances, a contract may be modified by a court due to extraordinary and unforeseen circumstances which make it impossible to perform under the contract, this theory has no applicability to the Lease. Courts have consistently held that the doctrine of legal frustration does not apply to situations where an unforeseen change merely results in a much higher cost to one party. Here, the rent is exactly what ATS agreed to and there are no legal theories which will excuse ATS from this obligation simply because ATS no longer wish to pay it.

As you are aware, ATS has failed to make the last two months payments to under the Lease and previously ATS has been late with its payments on numerous occasions for which interest has accrued under Section 4.4 of the Lease. In addition, it has been brought to our attention that Rolls-Royce has suspended its service contract with ATS due to ATS's failure to make payments as required under the terms of its contract with Rolls-Royce which has also resulted in a significant unpaid balance.

Regarding your proposed renegotiation of the terms of the Lease, Ryan has reviewed your proposed terms and has rejected them. Ryan is willing, however, to offer a three-year extension of the term of the Lease and to reduce the rent during the extension period to $80,000 per month. The rent during the current term, however, would remain unchanged. This of course would be contingent upon ATS paying in lump sum all amounts outstanding under the Lease and becoming current with Rolls-Royce and Ryan having received assurances that there are no liens on the aircraft. Please let us know if this is acceptable to ATS and we will prepare the appropriate documentation. This offer shall expire at 5:00 pm MT on November 1, 2024.

Please note that Ryan reserves all of his rights under the Lease and nothing herein shall be deemed to waive any of his rights.  ***Also, please be advised that given your default, pursuant to Section 17.3 of the Lease you are liable for all legal fees and costs caused by your default including the legal fees Ryan has incurred to date***.  Ryan is prepared to pursue legal action, if necessary to enforce these rights.

Very truly yours,

Douglas C. Waddoups

cc: Ryan Bowen

# EXHIBIT "3"

# PARR BROWN
# GEE & LOVELESS

**ATTORNEYS AT LAW**

**Douglas C. Waddoups**
Attorney at Law
*dwaddoups@parrbrown.com*

November 22, 2024

**VIA EMAIL and**
**VIA OVERNIGHT MAIL DELIVERY**

Attn: Mark B. Goldstein
Mark B. Goldstein, P.A.
2700 N. Military Trail
Suite 130
Boca Raton, FL 33431
Email: mbg@bizavlaw.com

Aircraft Transport Services, Inc.
4285 SW Martin Highway
Palm City, FL 34990

Re: Aircraft Lease Agreement dated December 28, 2022 (the "Lease") by and between 740SS, LLC ("Ryan"), as Lessor and Aircraft Transport Service, Inc. ("ATS"), as Lessee.  *Defined terms not otherwise defined herein have the meaning given to them in the Lease.*

Dear Mr. Goldstein,

We previously advised you that there have been Events of Default which Event of Default is continuing.  Given the ongoing Events of Default, Ryan hereby demands pursuant to Section 17.3 of the Lease that ATS immediately make the Aircraft, the Airframe, the Engines, the Parts, and all associated log books and maintenance records available for repossession at ATS's facility in Goodyear, Arizona.  Further, pursuant to Section 17.5 of the Lease, this letter serves as a written demand that the Aircraft be immediately sequestered from any further operation and delivered immediately into Ryan's custody.

Failure to comply with these demands will result in further breach of ATS' obligations under the Lease and will increase ATS's liability for damages.  Prompt, peaceful, and efficient cooperation with these demands is in everyone's best interest.  I look forward to hearing from you and coordinating with you for the immediate repossession of the Aircraft.

Page **1** of **2**

Note that Ryan reserves all rights and remedies under the Lease and nothing herein, nor the taking of any actions described herein including the repossession of the Aircraft, shall be deemed to be a waiver of any of his rights thereunder.

Very truly yours,

Douglas C. Waddoups

cc:     Ryan Bowen (740SS)

## SETTLEMENT AGREEMENT, RELEASE AND LEASE AMENDMENT

THIS SETTLEMENT AGREEMENT, RELEASE, AND LEASE AMENDMENT (this *"Agreement"*) is entered into this 4th day of December, 2024 (the *"Effective Date"*), by and between 740SS, LLC, a Utah limited liability company (*"Lessor"*) and Aircraft Transport Services, LLC, a Florida limited liability company (*"Lessee"*). Lessor and Lessee may be referred to herein individually as a *"Party"* and collectively as the *"Parties."*

### Background

A.      Lessor and Lessee are parties to that certain Lease Agreement, dated December 2022 (the *"Lease"*), under which Lessee leases from Lessor that certain Gulfstream Aerospace G-V aircraft, bearing registration mark N740SS and manufacturer's serial number 532, together with two (2) Rolls-Royce model BR710A1-10 engines bearing Serial Numbers 11169 and 11170 (the *"Aircraft"*). Any capitalized terms used in the Agreement and not defined herein shall have the meaning set forth in the Lease.

C.      Lessor has alleged and Lessee acknowledges an *"Event of Default,"* as provided for in Section 16(a) of the Lease (the *"Specified Default"*) which Event of Default is continuing.

D.      The Parties wish to cooperate in resolving the Event of Default and amending the termination date of the Lease pursuant to the terms set forth herein.

### Agreement

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, as well as for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**1.      Payments of Rent to Lessor.** Lessee agrees to pay Lessor a sum of Two Hundred Ninety-Four Thousand One Hundred and Ninety-Three Dollars ($294,193), representing the rent due for the months of October, November, and December of 2024 and prorated rent for the first three days of January 2025, to be paid in three equal payments of Ninety-Eight Thousand Sixty-Four Dollars and Thirty-Three Cents ($98,064.33) as follows: (1) the first payment to be paid to Lessor by December 4, 2024; (2) the second payment to be paid to Lessor by December 17, 2024; (3) the third payment to be paid to Lessor by January 3, 2025. In the event Lessee fails to make any payment hereunder when due, Lessee shall be in breach of this Agreement and the Lease and Lessor may without notice or delay exercise any remedies available to Lessor under the Lease.

**2.      Amendment Fee.** In addition to the payment of rent provided above, Lessee agrees to pay Lessor, as an amendment fee, the sum of Ten Thousand Dollars ($10,000), to be paid in three equal payments of Three Thousand Three Hundred Thirty-Three Dollars and Thirty-Three Cents ($3,333.33), as follows: (1) the first payment to be paid to Lessor by December 4, 2024; (2) the second payment to be paid to Lessor by December 17, 2024; (3) the third payment to be paid to Lessor by January 3, 2025. In the event Lessee fails to make any payment hereunder when due, Lessee shall be in breach of this Agreement and the Lease and Lessor may without notice or delay exercise any remedies available to Lessor under the Lease.

**3.      Delivery of the Aircraft.** Lessee agrees to deliver the Aircraft to Lessor at Lessee's hangar facility located at Phoenix-Goodyear Airport in Goodyear, Arizona, by no later than January 3, 2025 (the *"Delivery Date"*). Lessee further agrees that the Aircraft shall be delivered in full compliance with the terms of the Lease governing the return of the Aircraft upon termination of the Lease.

4938-8529-2033

1

**4.     Delivery of Log Books, Maintenance Records, and Parts.** Lessee agrees to deliver to Lessor, by no later than the Delivery Date, any and all log books and maintenance records, whether electronic or otherwise, in full compliance with the terms of the Lease.

**5.     Limitation on Flight Hours**. Lessee hereby covenants and agrees that the Aircraft shall not be flown more than Ninety (90) hours in the month of December 2024 (the "*Flight Hours Limit*").

**6.     Term Expiration**.     If, but only if, Lessee timely and fully complies with Sections 1 through 5 of this Agreement, effective upon the close of business on January 3, 205, the Lease shall be amended such that it shall expire on January 3, 2025.  The Parties agree that if Lessee does not fully comply with Sections 1 through 5 of this Agreement, the Lease term shall not expire on January 3, 2025, and shall continue pursuant to the terms of the Lease.

**7.     Release of Claims by Lessor in Favor of Lessee**.  In the event that Lessee fully complies with Sections 1 through 5 of this Agreement, Lessor agrees to release Lessee from any further liability under the Lease with respect to rent or late payments due.  If Lessee does not fully comply with Sections 1 through 5 of this Agreement, Lessee shall not be released from its liability under the Lease with respect to rent or late payments due.

**8.     Release of Claims by Lessee in Favor of Lessor**.  Lessee agrees to release Lessor from any further liability with respect to the Lease.

**9.     Miscellaneous.** This Agreement constitutes the entire agreement between the Parties as to the subject matter hereof.  Notwithstanding any conflict of laws provisions to the contrary, this Agreement shall be governed by the laws of the State of Florida.  This Agreement may not be modified except by a document signed by all of the Parties.  Signatures by the Parties for this Agreement or for any amendment or modification hereto may be exchanged by way of facsimile.  Each of the Parties represents and warrants that it has not assigned any Claim(s) released by this Agreement, or any interest therein, to any third party. Any waiver by any Party hereto of any breach of any kind or character whatsoever by any other Party, whether such waiver be direct or implied, shall not be construed as a continuing waiver of, or consent to, any subsequent breach of this Agreement on the part of said waiving Party.  In addition, no course of dealing between the Parties, nor any delay in exercising any rights or remedies hereunder or otherwise, shall operate as a waiver of any of the rights or remedies of the Parties.  This Agreement shall inure to and bind the successors, heirs, and assigns of the respective Parties hereto.

**10.     Severability.**  The provisions of the Agreement are severable.  If any part of this Agreement is found to be unenforceable, the other provisions shall remain fully valid and enforceable.  It is the intention and agreement of the Parties that all of the terms and conditions hereof be enforced to the fullest extent permitted by law.

**11.     Attorney Fees.**  If a civil action or other proceeding is brought to enforce this Agreement, the prevailing Party shall be entitled to recover from the Party against whom this Agreement is sought to be enforced all of his or its costs and expenses incurred in connection with any such action, including reasonable attorney fees.

**12.     Survival.**  All warranties, representations, indemnities, covenants, and other agreements made herein shall survive the execution and delivery of this Agreement.

**13.     No Effect on Validity or Enforceability of Lease.**  Notwithstanding any provision in this Agreement to the Contrary, the Lease, as amended hereby, shall continue in full force and effect subsequent to the execution of this Agreement, and shall constitute a valid and enforceable obligation on the Parties.  In the effect of any conflict between the terms of the Lease and the terms of this Agreement, the terms of this Agreement shall control.

4938-8529-2033

2

14. **Authority.** Each of the Parties represents and warrants to the other Party that the person signing this Agreement for such Party is authorized and has the right to surrender, compromise, settle, release, and cancel, such Party's claims, and any part thereof, and the Agreement, once executed, is enforceable in accordance with the terms stated herein.

15. **Time is of the Essence.** Time is of the essence regarding the dates and time constraints set forth in this Agreement.

16. **Counterparts.** This Agreement may be executed in one or more counterparts, any one of which need not contain the signatures of more than one Party, but all such counterparts taken together shall constitute one and the same agreement.

17. **Confidentiality.** The Parties, on behalf of themselves and each of their owners, officers, agents, and representatives shall keep the terms of the Lease and this Agreement strictly confidential, except that this Agreement may be discussed and/or shared with the Parties' legal and tax professionals. The Parties, on behalf of themselves and each of their owners, officers, agents, and representatives further covenant and promise that they will not at any time direct, make, publish, or communicate to any other persons or entities or in any public forum, directly or indirectly, any disparaging remarks, comments, or statements concerning the other Party or any of the Parties' respective employees, officers, and existing and prospective customers, suppliers, investors, and other associated third parties. This Section 17 does not, in any way, restrict or impede the Parties from exercising protected rights or their rights to enforce this Agreement, or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. Any Party receiving a subpoena or court order that would require the production of this Agreement shall notify the other Party of the same within 48 hours of receipt, so that a motion for protective order can be timely filed to prevent or limit disclosure and/or otherwise maintain, to the fullest extent possible, the bargained-for terms of this Agreement.

[*Signature Pages Follow*]



4938-8529-2033

**IN WITNESS WHEREOF**, the Parties have executed this Agreement to be effective as of the Effective Date.

**LESSOR:**

740SS LLC,
a Utah limited liability company

By: _____
   DocuSigned by:
   6AC3399D541F487...
Name: Ryan Bowen
Its: President

**LESSEE:**

AIRCRAFT TRANSPORT SERVICES, LLC,
a Florida limited liability company

By: _____
Name: _____
Its: _____

4938-8529-2033